Todd James WILEY, Appellant,

v.

The STATE of Texas, Appellee.

No. 09–90–183 CR.

Court of Appeals of Texas,
Beaumont.

Dec. 11, 1991.

As Corrected Dec. 18, 1991.

Michael A. McDougal, Conroe, for appellant.

Peter Speers, III, Dist. Atty., Kathleen Hamilton, Asst. Dist. Atty., Conroe, for State.

Before WALKER, C.J., and BROOKSHIRE and BURGESS, JJ.

## OPINION

WALKER, Chief Justice.

This is an appeal from the felony convictions of Robbery and Aggravated Kidnapping. Appellant was charged in a single indictment containing two counts. A single enhancement paragraph raised appellant's status for punishment purposes to that of a repeat felony offender. *See*, TEX.PENAL CODE ANN. § 12.42 (Vernon 1974). A jury found appellant guilty on both counts and assessed his punishment, after finding the enhancement paragraph "true," to ten (10) years imprisonment for Robbery, and twenty-five (25) years imprisonment for Aggravated Kidnapping. Punishment was to be served in the Institutional Division of the Texas Department of Criminal Justice, and both prison terms were to run concurrently. Appellant raises five points of error on appeal, three of which involve sufficiency of the evidence. As such, a rendition of the facts in the light most favorable to the verdict is in order.

On January 27, 1990, the complainant, Herbert Smith, went to the Pond Ridge Apartments in the Woodlands, Montgomery County to pick up his date for the evening, Michelle Nichols. Smith arrived at approximately 7:00 p.m. Upon entering Ms. Nichols' apartment, Smith observed four men playing cards and drinking liquor. One of the four men was the appellant.

Assured by Ms. Nichols that their date was still on, Smith sat and played cards with the men and drank a very small amount of a mixed drink. Ms. Nichols informed the four men that they would have to leave as she and Smith were about to leave to take Ms. Nichols' child to a babysitter. The four men, including appellant, agreed to leave.

After returning from the babysitter, Smith and Ms. Nichols decided to have a pizza sent to the babysitter as the sitter had not eaten. While Ms. Nichols changed clothes in her apartment, Smith walked to a nearby pizza-delivery establishment. This was the last time Ms. Nichols would see Smith for the rest of the evening.

After ordering the pizza, Smith was walking back to Ms. Nichols apartment when he encountered three of the four men he had previously met at Ms. Nichols' apartment. The three men consisted of James Bartee, Gary West, and appellant. Appellant and his two companions asked Smith if he would take them to a liquor store so that appellant, Bartee, and West could get a bottle. As there had been nothing but good feelings and friendliness on appellant's part towards Smith, Smith felt that this was the least he could do after making the men leave Ms. Nichols apartment.

Presuming the trip to be a short one, Smith did not notify Ms. Nichols he was taking the men to a liquor store. At the store, appellant went in to make the purchase while West and Bartee stood right beside Smith's truck. Smith's truck had an extended cab with two small seats behind the driver and passenger seats. When appellant reentered the truck, the men requested Smith to take them to an apartment so that the men could catch a ride. Smith agreed.

Without going into minute testimonial detail, the sum of Smith's remaining testimony was that after failing to make connections at the second apartment, the attitude of the men took on a belligerent tone to the point that they began to demand to be taken to various apartment complexes, food establishments, and convenience stores throughout south Montgomery County and the City of Conroe. From the record, it appears that the first trip to the liquor store began at approximately 9:00 p.m. and complainant was finally able to flag down a police vehicle at approximately 2:47 a.m. early Sunday, January 28, 1990. Within that period of nearly six hours, the

testimony reveals the level of intoxication of appellant and his two companions increased, as did their verbal and eventual physical abuse toward complainant.

■ Reading a cold record without the benefit of observing the physical and emotional responses, if any, of live witnesses is one of the major factors, if not *the* major factor, as to why the standard for a reviewing court bases an examination of the evidence "in the light most favorable to the verdict." In the instant case, what may appear from merely reading the statement of facts as nothing more than drunken buffoonery and school-boy pranks and high jinks, becomes, taken in light of the jury verdict, a night of mental and physical terror raised at points to sadistic and cold-hearted torture.

Testimony from the complainant, Smith, establishes that he first felt threatened at the third set of apartments when appellant insisted, in a loud and threatening manner, that Smith did not want to go on his date but wanted to stay and go drinking and partying with he (appellant), West and Bartee. From that point, complainant's testimony was essentially that he (complainant) was not free to leave; that he (complainant) was being verbally and physically terrorized; that the men were seriously damaging complainant's truck; that, after being physically beaten, complainant handed over some money upon appellant making what complainant took to be threatening suggestions; and that complainant and his truck were finally abandoned only after the serious threat of police intervention appeared imminent.

■ Having concluded a general recitation of the facts germane to the respective charges in the case before us, we now turn to the specific points of which appellant complains. Point of error one avers that the indictment for the offense of Robbery was fatally defective for failing to allege that the theft of property was from "another." From the record before us, there is no indication that the indictment was objected to by appellant prior to the day of trial. The failure to complain of defects in an indictment, whether of form or substance,

prior to the commencement of trial waives the defects. *State v. Oliver*, 808 S.W.2d 492, 494 (Tex.Crim.App.1991). *See, Studer v. State*, 799 S.W.2d 263 (Tex.Crim.App. 1990). Point of error one is overruled.

Point of error two states that the trial court's charge to the jury in the guilt/innocence phase was "fundamentally erroneous" in that it authorized a robbery conviction on less proof than required by the penal code for the offense of Robbery. The application paragraph of the trial court's charge on the Robbery count states:

> Now, if you find from the evidence beyond a reasonable doubt that on or about the 28th day of January, 1990 in Montgomery County, Texas, the defendant, Todd James Wiley, either acting alone or as a party with another as that term has been defined, did then and there intentionally or knowingly or recklessly, while in the course of committing theft of property and with intent to obtain or maintain control of said property, cause bodily injury to Herbert Smith by hitting him or kicking him, then you will find the defendant guilty of the offense of Robbery as charged in Count II of the indictment.

> Unless you so find beyond a reasonable doubt, or if you have a reasonable doubt thereof, you will acquit the defendant of the offense of Robbery.

TEX.PENAL CODE ANN. § 29.02 (Vernon 1989), provides:

> (a) A person commits an offense if, in the course of committing theft as defined in Chapter 31 of this code and with intent to obtain or maintain control of the property, he:

> > (1) intentionally, knowingly, or recklessly causes bodily injury to another;

> > ....

The trial court defined "theft" as, "... the unlawful appropriation of the property of another, with the intent to deprive such person of said property." This definition of theft actually differs from the one in the Penal Code. "Theft" defined in Penal Code as follows:

(a) A person commits an offense if he unlawfully appropriates property with intent to deprive the owner of property. *See* TEX.PENAL CODE ANN. § 31.03 (Vernon 1989).

 Since there was no objection to this particular portion of the charge to the jury by appellant at trial, any "error" must be so egregious and create such harm that appellant cannot be said to have had a fair and impartial trial. *Almanza v. State*, 686 S.W.2d 157, 171 (Tex.Crim.App.1984). In the instant case, the evidence is undisputed that the only person that appellant and his companions were inflicting any bodily injury upon was the complainant. It is also undisputed that the only property of "another" that was involved in being appropriated unlawfully belonged to the complainant. We find that, although the jury charge could have caused some confusion to the jury had there been others being assaulted or other property involved not belonging to the complainant, the charge measured against the facts before the jury was not harmful, egregious or otherwise, to appellant. The application paragraph essentially tracked § 29.02 of the Penal Code as set out above. Point of error two is overruled.

 Points of error three and four complain, respectively, "The evidence is insufficient to support the appellant's conviction for the offense of Robbery," and "The evidence is insufficient to support the appellant's conviction for the offense of Aggravated Kidnapping." As alluded to earlier, the standard for review of the sufficiency of evidence is whether viewing the evidence in the light most favorable to the verdict, any rational trier of fact could have found beyond a reasonable doubt the essential elements of the crime charged. *Jackson v. Virginia*, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979); *Butler v. State*, 769 S.W.2d 234 (Tex.Crim.App.1989). Furthermore, two very recent cases from the Court of Criminal Appeals have convinced us that additional standards also apply when the sufficiency of the evidence is questioned on appeal. *Walker v. State*, 823 S.W.2d 247 (Tex.Crim.App.1991); and

*Jones v. State*, 815 S.W.2d 667 (Tex.Crim. App. June 26, 1991) strongly reaffirm the concept that the sufficiency of the evidence must be measured against the jury charge, which the Court interprets as the entire charge. *See, Garrett v. State*, 749 S.W.2d 784 (Tex.Crim.App.1986); *Boozer v. State*, 717 S.W.2d 608 (Tex.Crim.App.1984); *Ortega v. State*, 668 S.W.2d 701 (Tex.Crim.App. 1983); and *Benson v. State*, 661 S.W.2d 708 (Tex.Crim.App.1983).

We will consider the specific evidence on each count separately so as to determine if the evidence is sufficient in light of the charge given. As to the Robbery count, we see the following direct examination testimony by the complainant, Smith, as significant:

Q. Was there ever any money exchanged between you and these people?

A. Yes, there was.

Q. Would you explain to the jury how that happened?

A. While they were punching on me, the three of them around me, they began making comments back and forth between them, that I must have money that, "look at the clothes he's wearing", "he's got a nice truck" and that to the effect that, "he has money, yeah, I know he has money, look at him." And at that point....

Q. Were they indicating that you actually had money on you probably?

A. Yes, that was my impression.

Q. Were there any comments about the fact that you were going out with Michelle that night?

A. Yes, there were.

Q. Can you give us that?

(Objections omitted.)

....

A. Yes, It's (sic) that I was going out, I was bound to have money on me.

Q. That was one of them making that comment?

A. Yes.

Q. What did you do when they were hitting and punching on you and then they started making comments about the

fact that you're bound to have money on you?

A. At that point I reached into my pocket, took my wallet out, and took out the money I had on me and handed it to Todd.

Q. When you handed it to Todd what did he do?

A. He folded it up and stuck it in his pocket.

Q. What happened next?

A. They allowed me to put the wallet back in my pocket and proceeded to hit on me a little more. At that time some people there in the complex were out and telling them that, to let them (sic) go that the police had been called and the police were on their way.

. . . .

On further direct examination by the State's attorney, the complainant was asked the following:

Q. You indicated that you took out your money and you gave it to Todd. Did you do that willingly?

A. No, I did not.

Q. During the time that you were giving this money to Todd, what happened just prior to that?

A. I had been hit several times in the face.

Q. What did you think would happen if you didn't give them the money they were talking about at the time?

A. I believed they would have hit me more and possibly use it as an excuse to again beating (sic) me in earnest in other places than the face and kicking me.

The complainant had testified only moments before that the major physical assault began after his truck had finally broken down in the parking lot of appellant's apartment complex. Specifically, as complainant attempted to leave on foot, appellant detained him and proceeded to hit complainant in the face with "jabbing type punches" which caused pain to the complainant.

We are guided in our discussion of point of error three by *Davis v. State,* 532 S.W.2d 626 (Tex.Crim.App.1976); and *Birl*

*v. State,* 763 S.W.2d 860 (Tex.App.—Texarkana 1988, no pet.). *Davis* provides that the elements of robbery are satisfied if a sufficient nexus exists between the antecedent violence and the parting with the property. *Birl* applied the *Davis* holding to a fact situation where the accused did not make any verbal threat or demand for property from the victim. The accused in *Birl* was walking next to the victim when the accused pulled out a pocket knife, opened the blade on it, and turned toward the victim. The victim screamed and began running away. As the accused ran after her, the victim dropped her purse. The accused picked up the purse and left the scene. Citing *Johnson v. State,* 541 S.W.2d 185 (Tex.Crim.App.1976), the Texarkana Court of Appeals in *Birl* stated that intent to obtain or maintain control of property may be inferred from actions, and a verbal demand is not required. *Birl, supra* at 863.

In the instant case, we find that a sufficient nexus exists between the antecedent violence inflicted upon the complainant and the taking of the money surrounded by the veiled threat contained in the "nice clothes, ... nice truck, ... going on a date" course of discussion going on among appellant, West, and Bartee. Our sufficiency of evidence analysis does not stop at this point, however. Preceding the application paragraphs for both the Robbery and Aggravated Kidnapping counts, the trial court's charge to the jury tracked the statutory language regarding conviction as a party. TEX.PENAL CODE ANN. §§ 7.01(a) and 7.02(a)(2) (Vernon 1974). The charge failed to apply the abstract theory of parties to the specific facts of the case. Neither the State nor the appellant objected to this. The *Walker, supra,* and *Jones, supra* cases are the latest application of the rule that it is the application paragraph of a jury charge that authorizes conviction, and an abstract charge on a theory of law which is not applied to the facts is insufficient to bring that theory before the jury. *Jones, supra* at 669.

In the instant case, both application paragraphs merely apply the law of parties as

follows, "..., the defendant, Todd James Wiley, either acting alone or as a party with another as that term has been defined, did then and there...." This language has been disapproved in *Johnson v. State*, 739 S.W.2d 299 (Tex.Crim.App.1987). Furthermore, Judge Clinton, author of the majority opinion in *Johnson*, warns trial courts in the following manner in his concurrence in *Walker:*

> Moreover, when the evidence raises that defendant is criminally responsible for conduct of another, taking "shortcuts" in the application paragraph by positing that defendant committed the offense "either acting alone or with [named party or 'another'] as a party to the offense as that term is hereinbefore defined" will mislead the jury if there is no evidence that the offense was committed alone by his conduct; nor will it sufficiently inform the jury which specific manner(s) of conduct enumerated in § 7.02(a)(2), i.e., "solicits, encourages, directs, aids, or attempts to aid" or some combination thereof, may permit it to find alternative criminal responsibility.

*Walker, supra,* 823 S.W.2d at 253.

In line, therefore, with *Walker, supra* and *Jones, supra* and the authorities cited therein, we hold that both the application paragraphs in the instant case were insufficient to bring the law of parties before the jury. That being the case, we must consider the evidence to see that if appellant was guilty at all, he was guilty solely by his own conduct. With regard to the Robbery count, we find that a rational trier of fact could have found all of the elements of Robbery beyond a reasonable doubt based upon appellant's conduct alone. As complainant's testimony indicated that appellant specifically struck complainant in the face with repeated jabs, and that it was appellant that took actual possession of complainant's money placing the money in his (appellant's) pocket, considering the surrounding circumstance specifically involving appellant, we find sufficient nexus between the antecedent violence perpetrated personally by appellant and the taking of the property personally by appellant. Point of error three is overruled.

■ We now turn to appellant's fourth point of error complaining of the sufficiency of the evidence to support his conviction for the offense of Aggravated Kidnapping. The same standards of review apply here as in our examination of appellant's Robbery conviction set out above. Recall our holding in point of error three that the law of parties was not before the jury because the trial court failed to apply the specific facts of the case to the law of parties in the application paragraph. In light of this holding, the evidence will be considered sufficient to support the conviction only if it establishes appellant's culpability on his conduct alone.

■ In order to find appellant guilty of aggravated kidnapping, the jury had to find that he intentionally or knowingly abducted the complainant with the intent to inflict bodily injury upon him. TEX.PENAL CODE ANN. § 20.04(a)(4) (Vernon 1989). Abduct "means to restrain a person with intent to prevent his liberation by: (A) secreting or holding him in a place where he is not likely to be found; ..." TEX.PENAL CODE ANN. § 20.01(2)(A) (Vernon 1989). Restrain "means to restrict a person's movements without consent, so as to interfere substantially with his liberty, by moving him from one place to another or by confining him. Restraint is 'without consent' if it is accomplished by: (A) force, intimidation, or deception; ..." TEX.PENAL CODE ANN. § 20.01(1)(A) (Vernon 1989).

■ In order to commit aggravated kidnapping, one must have committed kidnapping, which requires a knowing or intentional abduction, with the requisite specific intent. *Phillips v. State*, 597 S.W.2d 929, 936 (Tex.Crim.App.1980). In the instant case, the State was required to prove appellant abducted the complainant with the intent to commit bodily injury upon the complainant. As an abduction is a continuous, ongoing event, abduction has no time limit. *Weaver v. State*, 657 S.W.2d 148 (Tex.Crim.App.1983); *Sanders v. State*, 605 S.W.2d 612, 614 (Tex.Crim.App.1980).

**408**

During its case-in-chief, the State called appellant's sister, Jani Summers, to testify. Mrs. Summers testified that at approximately 10:45 p.m. on the evening of the 27th of January, appellant, Gary West, and the complainant stopped at her apartment to visit. Mrs. Summers' direct examination continued as follows:

Q. What was Todd doing with the beer in his hand?

A. He was visiting.

Q. Did anything else happen while they were there?

A. Herb had mentioned that he was being hijacked and if we can hold Todd and Gary there for five minutes, just give him five minutes to get away.

Q. Herb actually mentioned that to you and your husband and the other person while he was there?

A. Yes.

Q. Even before he mentioned that, could you tell what kind of state of mind Herb was in?

A. He seemed to be scared like he really knew he didn't belong there.

Q. And so after he made this request of y'all, "could y'all just hold these guys for five minutes while I get out of here" what happened?

A. Todd said, "don't listen to him, he's on acid."

Q. Did you necessarily believe Todd at that time?

A. No, considering Herb was drinking a Pepsi and everybody else was drinking a beer.

Q. Can you tell us what Todd did next?

A. Well, we were letting him know that we were ready to leave because it was close to eleven and we were ready to leave and that is when he kind of grabbed Herb like a hug and everything and letting him know not to be talking like that and they kind of roughed him up right there.

Q. When you say, "kind of roughed him up"—

A. And kind of shook him a little bit.

Q. But he was telling Herb not to talk to y'all?

A. Kind of like, "be quiet"; and I told him, "there is not going to be any of this going on in this apartment. It's time to go."

Mrs. Summers then described the scene that subsequently took place in the parking lot:

Q. When you went to the apartment parking lot what happened?

A. Todd was, Todd had a case of beer in his hand and he put it in the back of Herb's truck. He said, "Herb is our chauffeur tonight" and he put the beer in the back of his truck. At that time Herb tried to get in the truck to leave. You could tell he was trying to open the door and get in and that is when Todd grabbed him like this and had him between the door and truck and had him kind of pinned like that.

Q. So, are you saying that your brother made some type of, got some kind of a hold on Herb to keep him from getting in the pickup and leaving?

A. Yes.

Q. In your opinion did you think Herb was trying to leave by himself?

A. Yes.

Q. In your opinion did you feel that Herb was in fear for his safety?

A. Yes.

Later, on re-direct examination, Mrs. Summer was asked:

Q. Do you feel like you would have been putting your own physical safety in jeopardy if you had tried to help Herb?

A. Possibly.

Q. Okay. If someone else had tried to help Herb other than kinfolk, do you think they would have been putting themselves in jeopardy?

A. Definitely.

While a reading of the "cold facts" up to this point in the chronology of events may leave one with questions as to what exactly was going on, the combination of complainant's testimony with that of Mrs. Summers' leaves little doubt that an "abduction" had begun at Mrs. Summers' apartment complex. From there, the testimony of the complainant focuses on appellant in that it is appellant that directs complainant to

drive all over Conroe, from residential to isolated parts of the city. At one point, complaining that Smith's driving was erratic, appellant took control of the truck. After driving "fairly well" for approximately thirty minutes, appellant began to speed, perform "whisky runner U-turns, high speed U-turns on the road" and drive through yards. After several more stops, Smith's truck broke down in the parking lot of an apartment complex. The truck would not start and Smith attempted to leave on foot. Appellant personally stopped him and began striking Smith in the nose. This occurred just prior to the robbery scenario described in the discussion of point of error three.

We find that a rational trier of fact could have found the evidence sufficient beyond a reasonable doubt to convict appellant, acting alone, of Aggravated Kidnapping. A similar, albeit less complicated, set of facts occurred in *Fann v. State,* 696 S.W.2d 575 (Tex.Crim.App.1985). In describing why the evidence was sufficient to support the conviction in *Fann,* the Court stated:

> They (the victims) were forcibly driven away from the cemetery and around other parts of the city. The evidence reveals a constantly shifting path throughout the City of Irving. The victims were taken some distance from the area in which they might reasonably have been found and were kept isolated from anyone who might have been of assistance.

*Fann, supra* at 576. *See also, Sanders v. State,* 605 S.W.2d 612 (Tex.Crim.App.1980). Thus, the "secreting or holding him in a place where he is not likely to be found" element of the jury instructions was proven.

Appellant's brief on point of error four is devoid of case authority. Furthermore, appellant's rendition of the facts under this point of error are definitely not presented in the light most favorable to the verdict. His arguments are conclusory at best. Point of error four is overruled.

Appellant's final point of error cites the lack of sufficient evidence to support the jury's finding that the appellant did not voluntarily release the victim alive and in a safe place. The language of § 20.04(b) provides:

> An offense under this section is a felony of the first degree unless the actor voluntarily releases the victim alive and in a safe place, in which event it is a felony of the second degree.

The jury in the instant case found that the appellant "did not voluntarily release the victim alive *or* in a safe place." [1] This finding allowed the jury to consider the first degree punishment range rather than the second degree punishment range. As the jury also found appellant to be a "repeat offender," this required the jury to begin with fifteen (15) years, as the minimum, with regard to penitentiary time for a first degree felony conviction. This contrasts with starting with a minimum of five (5) years confinement in the penitentiary had the jury been considering the second degree punishment range. *See,* TEX.PENAL CODE ANN. § 12.42 (Vernon 1974). Recall that the jury returned a verdict of twenty-five (25) years confinement on appellant's Aggravated Kidnapping conviction.

In *Wright v. State,* 571 S.W.2d 24 (Tex.Crim.App.1978), the Court of Criminal Appeals approved, in substance, a jury charge that required the State to prove "beyond a reasonable doubt" that the victim was not voluntarily released alive and in a safe place. *Wright, supra* at 25. Because the State is saddled with the same heavy burden here as it is generally during guilt/innocence, our standard for reviewing the evidence on this point of error is the same as recited earlier under the *Jackson v. Virginia/Butler v. State* line of cases.

The fact that the complainant, Herbert Smith, lived to testify at trial focuses our discussion solely on the question of whether or not Smith was voluntarily released in a safe place. An examination of Smith's testimony reveals three places where he

---

1. There was no objection to the verdict form's use of the word "or" rather than the word "and" as is required by the Penal Code. Neither does appellant make any complaint of this wording on appeal. Any issue is, therefore, not before us.

discusses his "release." During direct examination in the guilt/innocence portion of the trial, Smith testified as follows:

Q. What happened that caused you to eventually be able to get away from these people?

A. The people in the apartment complex saying that the police had been called and they were on the way and that they did not need to have me there when the police were there, caused him to decide to let me go.

They let me get back in the truck and attempt to start it. At that time, the truck would not start. They ended up pushing it out of the parking lot across the street into a vacant lot there.

I walked after the truck following it and they did not follow me out of the parking lot at that time. I came up to the truck, reached into it and removed my keys and then proceeded to continue walking away. When I was a block ...

By Mrs. Clay–Jackson (for appellant): Objection, narrative.

By The Court: Alright.

Q. (State) What happened when you were about a block away?

A. When I was about a block away without pursuit, I then broke into a run and proceeded to go out of sight.

Q. When you went out of sight, did you eventually ...

By Mrs. Clay–Jackson: Objection, leading.

By The Court: Sustained, rephrase the question.

By Mr. Aylor (State): I'll rephrase it.

Q. Once you got out of sight, can you tell the jury whether or not you ever got in the company of a police officer?

A. Yes, I did.

During cross-examination of Smith, several other details were elicited:

Q. After the fight, you said you walked away, is that correct?

A. Yes, I did.

Q. You just walked away?

A. Yes.

Q. Ok. Which direction did you walk?

A. At that point with the apartment shaped thusly, I walked, following my truck in that direction and then continued that way.

Q. So you walked away from the bright lights, is that correct?

A. There were other bright lights from the freeway there and I did not care to go back past the apartment towards the other lights.

Q. When, during the course of the fight, were you ever told, "just to go on and leave man, just go on and leave"?

A. I was told that. I attempted to do so. The truck started briefly and would not start again and after that I was hit several more times.

Q. Well, when it wouldn't start, did you start walking away. When the truck wouldn't start, did you start to walk away?

A. They, I was prepared to do that, but they did not want me to leave the truck there in the parking lot.

Q. So is that when you testified that they moved the truck across the street?

A. Yes, they tried to push start it a couple of times and then just pushed it out of the apartment parking lot through the driveway across the street into a vacant lot there.

Q. So the fight continued across the street?

A. No, after the truck was pushed out of the parking lot, I followed the truck, they did not leave the parking lot, I walked past the truck and took the keys out of it and continued to go on.

Finally, during the punishment phase of the trial, the State called Smith to the stand to provide further testimony. Pertinent to this final point of error is as follows:

Q. Can you go ahead and tell the jury about those announcements being made?

A. Yes. The woman he identified as his girlfriend and the two Hispanic gentlemen came out and started repeatedly, first telling them just to let me go and leave me alone and then that they needed to let me go that the police had been called and the police were on their way.

Q. Okay, and up to that point had this defendant and the other two men made any indications that they were going to let you go?

A. None whatsoever.

Q. What had they been doing to you up to that point?

A. They'd been hitting me, taunting me, generally beating and the brutalizing.

Q. In your opinion did the announcement that the police were coming have some effect of their deciding to let you go?

A. Yes, it did.

Q. What was there (sic) action after the people told them, "look the police are coming, the police are coming"?

A. After they had been repeatedly told that, they first returned me to my truck and told me to leave and get out of there. When the truck would not start to leave they removed me from the truck and hit me a few more times and pushed the truck out of the parking lot. After which time I followed the truck and made my escape.

As this final issue is a fact question for the trier of fact, we must view the evidence from the viewpoint of the "rational trier of fact." *See, Arevalo v. State,* 749 S.W.2d 271 (Tex.App.—San Antonio 1988, pet. ref'd). From the facts elicited, complainant had been beaten for a significant period of time by three men; that the final beating occurred only moments before the complainant and his truck were abandoned in a vacant lot across from the apartment complex; that complainant's truck was clearly no longer operable; that the complainant had no means of transportation except his two feet; and that aid to complainant, either police or medical, was not easily accessible nor immediately recognizable to complainant. We find, therefore, that any rational trier of fact could have found beyond a reasonable doubt that the complainant, Herbert Smith, was not voluntarily released in a safe place.

In conclusion, "voluntary release in a safe place", should not be weighed from a standpoint of physical condition of a victim and that victim's ability to ultimately vacate or escape the immediate prevalence of the accused. It seems appropriate that any judgment or finding regarding "voluntary release in a safe place", must be viewed, weighed and determined solely from the conduct of the accused and not as to possibilities within speculated grasps of the victim. Being without square-on case law guidance, we conclude that an accused, in order to avail himself of the mitigating effect of § 20.04(b), must have performed some overt and affirmative act that brings home to the victim that he/she has been fully released from captivity. That release must occur in a place and manner which realistically conveys to the victim that he/she is now freed from captivity and is now in circumstances and surroundings wherein aid is readily available.

So as not to confuse the burden of proof on this subject. It is incumbent upon the State to prove beyond a reasonable doubt that the defendant did not perform those affirmative acts allowing mitigation under § 20.04(b). Point of error five is overruled.

Finding no error, we affirm the judgments and sentences of the trial court.

AFFIRMED.