**Robert TEER, Appellant,**

v.

**The STATE of Texas, Appellee.**

**No. 10–94–005–CR.**

Court of Appeals of Texas,
Waco.

April 5, 1995.

Walter M. Reaves, Jr., Waco, for appellant.

John W. Segrest, Crim. Dist. Atty., Beth Toben, Mark E. Parker, Asst. Dist. Attys., Waco, for appellee.

Before THOMAS, C.J., and CUMMINGS and VANCE, JJ.

## OPINION

VANCE, Justice.

Robert Teer was convicted of the aggravated kidnapping of Christina Teer, his estranged wife, from a Waco billiard hall. *See* TEX.PENAL CODE ANN. § 20.04(a) (Vernon 1994). A jury found him guilty and, because it also found that he did not voluntarily release Christina in a safe place, assessed his

punishment for the first-degree felony at forty years in prison. *See id.* § 12.32 (Vernon 1994); Act of May 24, 1973, 63rd Leg., R.S., ch. 399, 1973 Tex.Gen.Laws 883, 915, *amended by* Act of May 29, 1993, 73rd Leg., R.S., ch. 900, § 1.01, 1993 Tex.Gen.Laws 3586, 3615 (current version at TEX.PENAL CODE ANN. § 20.04(c) (Vernon 1994)). In two points of error, Teer complains that the evidence is insufficient for the jury to have found any aggravating element or to have found that he did not voluntarily release Christina in a safe place. In three additional points, he contends that the court erred in (1) refusing to allow him to present evidence that he had attempted to commit suicide on occasions prior to the offense, (2) overruling his objection to an argument during the punishment phase, and (3) overruling his objection to an argument that the State made during the guilt-innocence phase. We will reverse and remand for a new punishment hearing.

## FACTS

Christina and Teer had been married for about a year when they separated in September 1993. Christina went to the Family Abuse Center. On October 3, she began working as a waitress at Shooters, a Waco billiard hall. On October 13, a Wednesday, Teer went to Shooters for the purpose of persuading Christina to reconcile their marriage. She was not there, so he waited until she arrived. After Christina told him she did not want to get back together and did not want to talk to him, the manager of the club persuaded Teer to leave.

Teer and his father then went to Wal–Mart, where they purchased a shotgun, registering it in the father's name. Now armed, Teer returned to Shooters and informed Christina that she was leaving with him. After she refused, a struggle began and the shotgun discharged without serious harm to anyone. Teer grabbed Christina and forced her to accompany him to his car. They spent the next three days together in Centerville, Huntsville, and Buffalo. During that time, although Teer left Christina alone on several occasions, she did not attempt to escape. or contact anyone for help. While in Huntsville, they took the gun to Wal–Mart to get the money back, but because it had been purchased in Waco, they were unsuccessful. While in Buffalo, Teer heard a broadcast about a warrant having been issued for his arrest.

After hearing the broadcast, Teer told Christina to call her mother to see if they could go to her mother's house, which they did. After spending the night there, Christina called Detective Alston with the Waco Police Department and told him that she wanted to drop all charges. She also called the Family Abuse Center to say that she wanted to return. Teer found out that Alston had requested that the Limestone County Sheriff's Department arrest him. He left the house, returned, left again, and returned again. During this time, his father and aunt came to see him. He gave the gun to his father, who left in Teer's car, leaving his own vehicle for Teer to drive. Later, as his father and aunt returned, Teer passed them on the road, made a u-turn, and returned to the house. He was arrested a short time later.

## SUFFICIENCY OF EVIDENCE OF INTENT

Teer's second point asserts that the evidence is insufficient to establish that he intended to commit the kidnapping in a way that would aggravate the offense. *See* TEX.PENAL CODE ANN. § 20.04(a)(1)–(6). Sufficiency of the evidence is determined from the charge given to the jury. *Jones v. State,* 815 S.W.2d 667, 668 (Tex.Crim.App.1991). The charge authorized the jury to convict Teer of aggravated kidnapping if it found that he abducted Christina with intent to (1) use her as a shield or hostage, (2) inflict bodily injury on her, (3) violate or abuse her sexually, or (4) terrorize her. *See* TEX.PENAL CODE ANN. § 20.04(a)(2), (4), (5). Any one of the aggravating elements is sufficient. *See id.* Evidence will sustain a conviction if, viewing it in the light most favorable to the verdict, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *Jackson v. Virginia,* 443 U.S. 307, 318–19, 99 S.Ct. 2781, 2788–89, 61 L.Ed.2d 560 (1979); *Matson v.*

*State,* 819 S.W.2d 839, 843 (Tex.Crim.App. 1991).

■ "Terrorize" is not defined by the Penal Code. "Webster's New Collegiate Dictionary defines 'terror' as 'to fill with intense fear or to coerce by threat or force.'" *Rogers v. State,* 687 S.W.2d 337, 341 (Tex.Crim. App.1985). "One's acts are generally reliable circumstantial evidence of one's intent." *Rodriguez v. State,* 646 S.W.2d 524, 527 (Tex. App.—Houston [1st Dist.] 1982, no pet.). The fear of anticipated infliction of imminent bodily injury or death is sufficient to indicate an intent to terrorize. *Id.*

■ Christina testified that Teer pointed the shotgun at her and said, "[G]et up bitch, or I will shoot you." She said that she "felt really scared." She also said that, as they left Shooters, she "really was scared, I thought that he was going to kill me that time." Based on this testimony alone, a jury would be justified in inferring that he intended to terrorize her when he returned to Shooters with a shotgun. *See* TEX.PENAL CODE ANN. § 20.04(a)(5). Thus, we find that a rational jury could have so found beyond a reasonable doubt. *See Jackson,* 443 U.S. at 318–19, 99 S.Ct. at 2788–89; *Matson,* 819 S.W.2d at 843.

Having found that the evidence is sufficient to support the jury's finding that Teer intended to terrorize Christina, we need not examine whether it is sufficient to support a finding of any other aggravating element. We overrule point two.

## SUFFICIENCY OF EVIDENCE OF VOLUNTARY RELEASE

■ Teer's first point asserts that there is "insufficient evidence to establish that [he] did not voluntarily release the victim alive and in a safe place...." At the time of Teer's trial, the Penal Code provided that aggravated kidnapping was a first-degree fel-

ony unless the defendant had voluntarily released the victim alive in a safe place, in which event the offense would be punishable as a second-degree felony. Act of May 24, 1973, 63rd Leg., R.S., ch. 399, 1973 Tex.Gen. Laws 883, 915 (amended 1993). The State bore the burden of proving that any release was not voluntary or that it was not in a safe place.[1] *See Williams v. State,* 851 S.W.2d 282, 286 (Tex.Crim.App.1993) (provision operates like a legal defense, with the initial burden of production on the accused, but the ultimate burden of persuasion on the state). Thus, we apply the *Jackson* standard to determine if, viewing the evidence in the light most favorable to the verdict, any rational trier of fact could have found beyond a reasonable doubt that Teer did not voluntarily release Christina or that he did not release her in a safe place. *See Jackson,* 443 U.S. at 318–19, 99 S.Ct. at 2788–89; *Matson,* 819 S.W.2d at 843.

The record supports Teer's assertion that whether he voluntarily released Christina was "hotly contested." *See Williams,* 851 S.W.2d at 286 (evidence must raise the issue). He asserts that, because he took her to her mother's house in Teague without being compelled to do so, he voluntarily released her. He suggests that "two factors support a finding of voluntary release," *i.e.,* his allowing Christina to call the authorities and the Family Abuse Center to tell them where she was and his leaving her at her mother's house when he left on more than one occasion.[2] The State, pointing to *Wiley v. State,* argues that the release was not voluntary because Teer knew that intervention by the authorities was imminent. *See Wiley v. State,* 820 S.W.2d 401, 411 (Tex. App.—Beaumont 1991, no pet.) (finding regarding "voluntary release in a safe place" must be viewed, weighed, and determined solely from the conduct of the accused and not as to possibilities within "speculated

---

1. Effective September 1, 1994, a defendant has the burden of proof on the issue. TEX.PENAL CODE ANN. § 20.04(c) (Vernon 1994). We would then review the factual sufficiency of the evidence on an issue which the defendant must prove. *See Meraz v. State,* 785 S.W.2d 146 (Tex.Crim.App. 1990).

2. We do not, however, look to evidence that would have supported a finding contrary to the one that the jury made; we look at the evidence in the light most favorable to the verdict. *See Jackson v. Virginia,* 443 U.S. 307, 318–19, 99 S.Ct. 2781, 2788–89, 61 L.Ed.2d 560 (1979); *Matson v. State,* 819 S.W.2d 839, 843 (Tex.Crim. App.1991).

grasps" of the victim). *Wiley* holds that "the release must occur in a place and manner which realistically conveys to the victim that he/she is now freed from captivity and is now in circumstances and surroundings wherein aid is readily available." *Id.* The Beaumont Court concluded that the evidence was sufficient to support the jury's finding that the victim had not been voluntarily released because he testified that he was released only after his captors heard that the police were coming. *Id.*

The interpretation given to the term "voluntary" by the Beaumont Court in *Wiley* makes critical the point in time at which the kidnapper learns that he is being sought by authorities. *Id.* Thus, a release would almost always be involuntary. If the purpose of the statute's mitigating provision is to induce kidnappers to release victims alive and in a safe place, conduct which achieves that result must be effective to lessen the punishment up to the "eleventh hour." To hold otherwise is to say that, once authorities begin to search for the kidnapper, the victim has been "written off."

The legislature did not define "voluntary" as that term is used in the aggravated kidnapping statute. Therefore, the legislature is presumed to have intended that it be given its ordinary meaning. *Morrow v. State*, 862 S.W.2d 612, 614 (Tex.Crim.App.1993) ("Where statutory terms are not defined by the legislature, we ascribe to those terms their ordinary meaning.") (citing *Vernon v. State*, 841 S.W.2d 407 (Tex.Crim.App.1992)). The ordinary meaning of "voluntary" includes the following: "proceeding from the will or from one's own choice or consent"; "done by design or intention"; "having power of free choice." MERRIAM WEBSTER'S COLLEGIATE DICTIONARY 1324 (10th ed. 1993).

We believe the clear legislative policy advanced by the provision that mitigates a kid-napper's punishment if the victim is released unharmed is to promote the victim's safety and well-being by giving the kidnapper an incentive to release the victim unharmed in a safe place. The incentive is that the kidnapper is punished for a lower degree of felony. Act of May 24, 1973, 63rd Leg., R.S., ch. 399, 1973 Tex.Gen.Laws 883, 915 (amended 1993). We reject the analysis used by the Beaumont court in *Wiley* because it does not secure the purpose or benefit of the mitigating factor evident on the face of the statute. *See Alford v. State*, 866 S.W.2d 619, 623 (Tex.Crim. App.1993) ("The principle rule is that a statute, when susceptible to more than one construction, will be interpreted so as to secure the purpose or benefit intended.") (citing *Ward v. State*, 829 S.W.2d 787, 791 (Tex. Crim.App.1992)).[3]

Under the Beaumont court's interpretation, there is absolutely no incentive for a kidnapper to release a victim unharmed once his arrest becomes imminent because he is no longer acting "voluntarily." Thus, in a stand-off between law officers and a kidnapper holding his victim, there would be no incentive under *Wiley* for him to release the victim unharmed. *Wiley's* interpretation of the term "voluntary" thus detracts from or defeats the purpose behind the provision—*i.e.*, to promote the victim's well-being by giving the kidnapper an incentive to release the victim unharmed. For this reason we will not apply *Wiley's* reasoning or result.

Christina survived the kidnapping. *See* Act of May 24, 1973, 63rd Leg., R.S., ch. 399, 1973 Tex.Gen.Laws 883, 915 (amended 1993).[4] She testified that, while she and Teer were in Buffalo at the motel, they saw their pictures on the six o'clock TV news and heard that a warrant had been issued for his arrest. She said that Teer "got real scared. He jumped up and was saying, you have to call your mom, you have to call your mom

---

**3.** We recognize that in *Alford* the Court of Criminal Appeals, finding the legislature did not intend to subject a person to criminal liability for an accidental act, defined the term "voluntarily" in the context of culpability as meaning "the absence of an accidental act, omission or possession." *Alford v. State*, 866 S.W.2d 619, 622 (Tex.Crim.App.1993); TEX PENAL CODE ANN. § 6.01(a) (Vernon 1994). In that context, the Court said, " '[V]oluntarily,' as used in section

6.01(a), does not include the concept of free will." *Id.*

**4.** We attach no significance to the fact that the amended version of the voluntary-release provision deletes the requirement that the victim be released "alive." The "safe place" requirement appears to include "alive."

and get her to drop charges." She also said he did that "because he was scared he was going to get caught."

They drove to a pay phone, where Christina called her mother, Norma Freeman, told her where they were, and asked her to call the police to see if charges could be dropped. They drove around, then she called her mother again to find out if "it was okay to come home." They drove from Buffalo to the Freeman residence in Teague, arriving at about 11:00 p.m. on Friday evening. Christina said that her mother "gave Robert a big hug" and they talked like nothing had happened. She said that her stepfather did not talk to her that night and her sister "just did her own thing." Teer and her mother talked late into the night while Christina slept on a pallet in the same room.

The next morning, Teer asked Christina to find out if a warrant was still outstanding. She tried to call Detective Alston, but "couldn't get through." She said that Teer's father arrived and was "really upset about everything, he was crying, and haggling [Teer], and just really scared about what had happened." He stayed about twenty minutes, then left in the car that they had used during the three days, taking the gun with him. Later, she called Detective Alston and made arrangements with him for Teer and her to "come in [the next] Monday" and to bring the gun with them.

Christina said that, although she had told Teer during the three-day trip that they would "get back together," she intended to return to the Family Abuse Center. She called the Center to say that she wanted to return. Detective Alston called back, and she told him that she wanted to go to the Center. He told her that someone would come to pick her up and return her to the Center and to arrest Teer. When Teer found out that he would be arrested, he "drove off in [his father's truck], and came back, drove off, and came back." She said that she was afraid that "they would either chase him down, or he would go out and kill himself or something."

Teer's aunt testified that she went to the Freeman residence with Teer's father on Saturday morning. When they arrived, Ms.

Freeman and Teer came out of the house. Teer went to the car, got the gun, put it in the box it had come in, and turned it over to his father. When she and Teer's father left in the car to go to the sheriff's office in Fairfield, they took the gun with them. While returning to the Freeman residence, they met Teer on the road, and he turned around and followed them back to the house.

Teer's father, William, testified that after they left the Freeman residence the second time, he drove his pickup and Teer's aunt drove the car. They met law enforcement officers on the road. He returned to the residence with them, and the officers arrested Teer.

Christina testified that when Sheriff's deputies arrived, "it was a real mess. He got real scared and everything, and went into the back room, and his dad was trying to calm him down, and told him to sit on the bed." The deputies finally arrested Teer. They took Christina to the courthouse in Fairfield, where she was met by representatives of the Family Abuse Center.

In summary, the evidence shows that when Teer decided to take Christina to her mother's house, authorities did not know where they were. After taking her there, he turned the gun over to his father and, in more than one instance, left the residence without taking Christina with him. We believe that, considering all the evidence in the light most favorable to the jury's verdict, the evidence is insufficient to support the jury's implied finding beyond a reasonable doubt that Teer did not voluntarily release Christina in a safe place. We sustain point one.

The finding of a voluntary release "only mitigates punishment"; it does not excuse or justify commission of the offense. *Williams,* 851 S.W.2d at 286. Thus, our holding will result in a new punishment hearing rather than a new trial. *See* TEX.CODE CRIM.PROC. ANN. art. 44.29(b) (Vernon Supp.1995).

## EVIDENCE OF PRIOR SUICIDE ATTEMPTS

Teer's fourth point complains that the court prevented him from presenting evidence, through his mother, that he had at-

tempted suicide six months and two months prior to the date of the offense. The State objected that the probative value of the testimony was outweighed by its prejudicial effects because it was too "remote," was "an attempt to elicit sympathy," and was based on hearsay. The objection was sustained over Teer's argument that it was relevant to show his lack of intent to commit one of the aggravating elements of the offense. Teer further suggests that his emotional state was relevant because of evidence in the record that he threatened to commit suicide during his and Christina's three-day journey.

 Evidence is relevant if it has any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence. TEX. R.CRIM.EVID. 401. When the court excludes testimony offered by a criminal defendant, the burden on appeal is to show that the court abused its discretion in excluding the evidence. *Johnson v. State*, 698 S.W.2d 154, 160 (Tex.Crim.App.1985), *cert. denied*, 479 U.S. 871, 107 S.Ct. 239, 93 L.Ed.2d 164 (1986). Exclusion of evidence will result in reversal only where a substantial right of the accused has been affected. *Breeding v. State*, 809 S.W.2d 661, 663 (Tex.App.—Amarillo 1991, pet. ref'd).

██ The State urges that the test of relevancy set forth in *Montgomery v. State* should be applied: "[W]ould a reasonable person, with some experience in the real world believe that the particular piece of evidence is helpful in determining the truth or falsity of any fact that is of consequence to the lawsuit." *Montgomery v. State*, 810 S.W.2d 372, 376 (Tex.Crim.App.1990). We agree, although we reach a different conclusion than the State.

 As we have noted, the issue of Teer's intent that would aggravate the offense was contested. Although whether an issue is contested does not affect the relevancy of evidence offered on that issue, testimony about prior suicide attempts was "evidence having any tendency to make the existence of [Teer's intent to commit an aggravating factor] more probable or less probable than it

would be without the evidence." *See* TEX. R.CRIM.EVID. 401; *Mayes v. State*, 816 S.W.2d 79, 84 (Tex.Crim.App.1991) (Rule 401 makes no demand that facts or issues be contested before evidence that tends to prove or disprove those facts is regarded as relevant). During the State's case-in-chief, testimony had been elicited from Christina without objection about his threats to kill both of them and kill himself. Teer had also elicited similar testimony from her during cross-examination. Further, the State's objection that the testimony was an "attempt to elicit sympathy" and was based on hearsay did not direct the court's attention to the relevancy issue.

The "remote" objection invoked Rule 403. *See* TEX.R.CRIM.EVID. 403. Rule 403 provides: "Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, or needless presentation of cumulative evidence." *Id.* Because Rule 403 favors admissibility of relevant evidence, the presumption is that relevant evidence will be more probative than prejudicial. *Montgomery*, 810 S.W.2d at 389 (on rehearing). The court's determination under Rule 403 is reviewed by the abuse-of-discretion standard. *Id.* at 390. The record reflects that the court balanced the probative value of the testimony against the Rule 403 factors, and we believe that the court did not abuse its discretion in refusing to allow Teer's mother to testify about the prior suicide attempts. *See* TEX.R.CRIM. EVID. 403. We overrule point four.

### JURY ARGUMENTS

Teer's third point asserts that the court erred in overruling his objection to the prosecutor's argument, during the punishment phase, that he was a "mean, dangerous, wild man." He says that the argument "personally abused" him and was improper, citing *Swilley v. State*, 114 Tex.Crim. 228, 25 S.W.2d 1098 (1929). The State responds that the argument fits within the four recognized categories of proper jury argument because it was a logical deduction from the evidence presented. *See Alejandro v. State*, 493

S.W.2d 230, 231 (Tex.Crim.App.1973). Alternatively, the State says that the error, if any, did not contribute to Teer's conviction or punishment. *See* TEX.R.APP.P. 81(b)(2).

Because we have determined that we must reverse the judgment and remand for a new punishment hearing and because the complained-of argument also occurred during the punishment phase, we do not reach this point.

■ Teer's fifth point urges that the court erred in overruling his objection to the State's argument during the guilt-innocence phase that improperly asked the jury to "explain their verdict." The prosecutor said:

Now you tell me that woman was not terrorized. If you don't think that is terror, then I don't want to hear anybody else complaining that our office dropped those kinds of cases.

Teer objected on the grounds that the argument was "improper," and the court overruled it. He says that similar arguments have been condemned in *Carter v. State,* 650 S.W.2d 843, 847 (Tex.App.—Houston [14th Dist.] 1982) ("[W]ho wants to walk out and tell [the rape victim] . . . it was all for nought?"), *aff'd,* 650 S.W.2d 793 (Tex.Crim. App.1983), and *Coble v. State,* 871 S.W.2d 192, 204 (Tex.Crim.App.1993) ("[I]f you can't do that, after the trial is over I want you to meet with me and tell me why you couldn't do it."), *cert. denied,* —— U.S. ——, 115 S.Ct. 101, 130 L.Ed.2d 50 (1994). The State asserts that the argument was a plea for law enforcement. *See Alejandro,* 493 S.W.2d at 231. Alternatively, the State says that the error in overruling Teer's objection was harmless because of (1) the *Harris* factors and (2) overwhelming evidence against him. *See Harris v. State,* 790 S.W.2d 568, 587–88 (Tex.Crim.App.1989). It further points out that the error in *Coble* was determined by the Court of Criminal Appeals to be harmless. *See Coble,* 871 S.W.2d at 206. We will assume, without deciding, that the argument was improper and that the court erred in overruling Teer's objection.

■ We must reverse for error in overruling an objection to jury argument unless we can say beyond a reasonable doubt that the error did not contribute to the conviction or the punishment assessed. *See* TEX. R.APP.P. 81(b)(2). Therefore, it becomes necessary to look at the evidence adduced at both stages of trial. *See Allridge v. State,* 762 S.W.2d 146, 155 (Tex.Crim.App.1988), *cert. denied,* 489 U.S. 1040, 109 S.Ct. 1176, 103 L.Ed.2d 238 (1989). In making that determination, we will consider the following six factors: (1) the source of the error; (2) the nature of the error; (3) whether or to what extent the error was emphasized by the state; (4) the probable implications of the error; (5) how much weight a juror would probably place on the error; and (6) whether declaring the error harmless would encourage the state to repeat it with impunity. *See Harris,* 790 S.W.2d at 587–88. We do not focus on the propriety of the outcome of the trial, but on the integrity of the process that led to conviction and punishment. *See id.* at 587.

Utilizing the *Harris* factors, we hold that, when the comments complained of are viewed in context of the evidence and the argument of counsel as a whole, the error—if any—was harmless. *See* TEX.R.APP.P. 81(b)(2). We overrule point five.

## CONCLUSION

Having found that the evidence was sufficient to support the jury's verdict of guilt of aggravated kidnapping but insufficient to support the finding of no voluntary release, we reverse the judgment and remand the cause for a new punishment hearing. *See* TEX.CODE CRIM.PROC.ANN. art. 44.29(b).

CUMMINGS, Justice, dissenting.

Because I do not believe that Teer released Christina voluntarily in a safe place, I respectfully dissent. The majority apparently assumed Christina was "released" when Teer took her to her mother's home because its entire discussion is focused on whether the "release" was voluntary.

I believe our analysis should first consider whether Christina was released when Teer took her to her mother's home. If we should determine that she was released at that time, then we should consider whether the release was voluntary and if it was in a safe place.

Because, after considering the unusual circumstances at her mother's home, I do not believe she was released when Teer took her there. Therefore, we would not reach whether the release was voluntary or in a safe place.

The legislature did not define "release" as that term is used in the aggravated kidnapping statute. We will, therefore, use its ordinary meaning which includes any of the following: "liberation, discharge, or setting free from restraint or confinement." BLACK'S LAW DICTIONARY (5th Ed.1979). The record reveals that Christina had married Teer when she was only sixteen years old and that she had tried to separate from Teer on several occasions, each time going to her mother's home. On each of those occasions, Teer would effect a reconciliation at her mother's home. Prior to her abduction from Shooter's billiard hall, Christina had separated from Teer and moved to the Family Abuse Center in Waco, apparently hoping that Teer would not be able to find her. Even so, in less than a month, Teer found her and armed with a shotgun, forcibly took her against her will from her place of employment. During the flight from the billiard hall to Teer's car, he pointed the gun at her and told her "get up, you bitch, or I will shoot you." She fell on the way to the car and he pointed the gun at her face again. He did not verbally threaten her at that time, but she stated "I really was scared, I thought he was going to kill me that time." She further stated that she begged him not to shoot her, stating "please don't shoot me, I will do anything, just don't shoot me." After the abduction, they spent the next three days at various motels along the I–45 corridor toward Houston, during which time Christina had opportunities to escape when Teer would leave the motel room to get provisions. She did not attempt to escape, however, and a "rational jury" could have reasoned from the evidence that since Teer had always found her before when she attempted to leave him, that an escape would have been futile. It seems appropriate that any judgment or finding regarding "voluntary release in a safe place" must be viewed, weighed and determined solely from the conduct of the accused and not as to possibilities within speculated grasps of the victim. *Wi-*

*ley v. State*, 820 S.W.2d 401, 409 (Tex.App.— Beaumont 1991, no pet.).

On the third day after the abduction, Christina and Teer saw on television that a warrant had been issued for his arrest. Teer became upset and directed Christina to call her mother and request her to call the police and drop the charges. He further would not leave the motel until Christina had called her mother again to confirm that charges had been dropped, after which, he took Christina to her mother's home. The evidence reveals that prior to the abduction Teer had been living at Christina's mother's home and that her mother was quite fond of Teer. In determining whether Christina was released at her mother's home, it is crucial to consider that Teer did not leave her there. He stayed there and continued to direct her to make calls to the police to try to get the warrant dismissed and to the Family Abuse Center to advise them that she was safe at her mother's. During these calls Teer was listening, but due to the skills of the social workers at the Family Abuse Center, they recognized that Christina was still a hostage and needed to be rescued. It was due to their efforts that Christina was finally liberated from Teer at her mother's home simultaneous with Teer's arrest. It was then that she was taken to the place she called "home", the Family Abuse Center.

From these circumstances, I believe that a rational jury could have found beyond a reasonable doubt that Christina was not released from her hostage situation while at her mother's home until she was taken from there by the police. Having so found, it would not be necessary to determine "voluntariness" or whether the home was a "safe place." Subject to a decision on the point of error concerning improper jury argument which the majority did not reach, I would affirm the judgment.