Henry BROWN, Appellant,

v.

The STATE of Texas, Appellee.

No. 12–00–00145–CR.

Court of Appeals of Texas,
Tyler.

Nov. 28, 2001.

Discretionary Review Granted
April 10, 2002.

Donald F. Killingsworth, for appellant.

Edward J. Marty, Tyler, for state.

Panel consisted of DAVIS, C.J., WORTHEN, J., and GRIFFITH, J.

LEONARD DAVIS, Chief Justice.

Appellant Henry Brown ("Appellant") was sentenced to thirty years of imprisonment for aggravated kidnapping. In one issue, Appellant asserts the evidence is factually insufficient to support the jury's finding that he did not voluntarily release the victim in a safe place, which would have reduced his maximum sentence to twenty years. We affirm.

### BACKGROUND

Appellant and LaVonne Brown ("Brown"), the victim in this case, were married in 1978, but had been divorced for approximately four years at the time of the kidnapping. Brown divorced Appellant because he was romantically involved with Patty Pearsall ("Pearsall") and refused to

terminate the relationship, despite Brown's insistence. After their divorce, Appellant and Brown continued to have contact, but their relationship was turbulent. Appellant frequently called Brown, trying to reconcile with her, but she refused. From time to time, Brown and Pearsall had confrontations as well, which caused further conflict between Appellant and Brown.

On the day of the kidnapping, Appellant called Brown repeatedly at her job in Tyler, Texas and insisted that she meet him to talk. She refused at first, but when the calls continued, Brown felt threatened and decided to comply. Brown drove to where Appellant worked, which was also in Tyler, and they stayed outside to talk. Brown sat in her car with the window rolled down, and Appellant stood beside the car.

As they talked, Appellant moved toward the rear of the car and grabbed the door handle, but found that the car was locked. Brown refused to unlock the door and immediately felt something on the side of her throat that she thought was a knife. Brown and Appellant struggled, and the knife hit Brown in the neck, cutting her throat deeply enough that blood shot out "across the dashboard, the windshield, everything" and was like "just turning a water hose on." Appellant then unlocked the car door, got in, and pushed Brown into the floorboard. Although Brown was crying and asking him to take her to the hospital, he refused and told her to "sit over there and shut up." She stated that the blood in her throat was "gurgling" and that she was choking and spitting.[1]

Appellant drove away from his place of employment and out of Tyler on Highway 271. Brown testified that, as they drove, she asked Appellant five times to take her to the hospital. Each time he refused, although at one point, Brown felt the car turning back toward town. Appellant then said, "No, I'm not going to do that," and continued driving away from town. She also asked him if he would take her to UT Health Center, but he refused that request as well.

They drove to the location where Brown had previously lived, which was approximately ten miles outside Tyler on Highway 271. Her house had burned, but Appellant parked the car behind what was left of the house, got out of the car, and began looking for a gun that Brown always kept under the back seat. He became angry when he learned the gun was not in Brown's car, and she got out of the car to try to calm him. As they stood outside, Appellant told her he had intended for that to be "their last day." He also told her he had planned for both of them to be dead and that "they would find us off in [the woods]." Brown testified that during their conversation, she was beginning to lose consciousness, and Appellant tried to get her back in the car.

After they were both in the car again, Appellant used Brown's cellular phone to call Pearsall. When she answered, he said, "Pat, I did it. I finally did it." Although Brown could not hear Pearsall's response, she tried to make some noise to alert Pearsall, but Appellant jerked the plug out of the cigarette lighter to disconnect the call and told her to be quiet. At that time, she asked him again to take her to the hospital, but she said he was "[t]elling me okay, but then it's not okay." Appellant then started turning the car around as though he was going to head out the driveway, but he stopped and made two

---

1. Dr. Luis Fernandez, the trauma surgeon who performed Brown's surgery when she was delivered to the emergency room, testified that the knife punctured Brown's trachea. As a result, blood was seeping into her windpipe, and she was drowning in her own blood.

more phone calls. During the second call, he began driving very slowly toward Highway 271. Brown again asked Appellant to take her to the hospital, and he eased out of the driveway and onto Highway 271.

Once Appellant was on the highway, he moved over into the other lane, and Brown was afraid that he planned to turn around and go back to where the house had burned. She testified that she looked at him and said, "If you'll please take me to a hospital, I'll tell them I did it." His response was "You promise you'll do that? You promise you'll do that?" Brown testified that she was crying and told him she promised she would if he would take her to the hospital. He agreed and drove her to the emergency room at Mother Frances Hospital.[2]

### DEFINITION OF "VOLUNTARY"

█ If, at the punishment phase of an aggravated kidnapping trial, the defendant proves by a preponderance of the evidence that he voluntarily released the victim in a safe place, the offense is reduced to a second degree felony. TEX. PEN.CODE ANN. § 20.04(d) (Vernon Supp.2001). The Legislature did not define "voluntarily," however, and we must do so prior to addressing the issue raised by Appellant.[3]

█ When we interpret a statute, we seek to discern the collective legislative intent or purpose. *Boykin v. State*, 818 S.W.2d 782, 785 (Tex.Crim.App.1991). In our analysis, we necessarily focus our attention on the literal text of the statute because the text is the only *definitive* evidence of what the legislators had in mind when the statute was enacted. *Id.* (emphasis in original). If the meaning of the statutory text, when read using the relevant canons of construction, should have been plain to the legislators who voted on it, we will give effect to the plain meaning. *Id.* We may consider extratextual factors such as executive or administrative interpretations of the statute or legislative history if the plain language of a statute would lead to absurd results, or if the language is ambiguous. *Id.* at 785–86. Because neither of those circumstances exists in this case, we seek to determine the plain meaning of "voluntary" at the time section 20.04(d) was enacted. *Id.* at 785.

█ In defining "voluntary," we are bound to adopt a construction that "[opens the word] to the broadest possible understanding in the context of which [it] is reasonably susceptible in ordinary English." *Tyra v. State*, 897 S.W.2d 796, 797 (Tex.Crim.App.1995). We also recognize that jurors are permitted to freely read statutory language to have "any meaning acceptable in common parlance," *Vernon v. State*, 841 S.W.2d 407, 409 (Tex.Crim.App. 1992), and acknowledge that we should not adopt a definition that is different or more restrictive than the jurors themselves were

---

2. At the guilt/innocence phase, Appellant testified that Brown voluntarily drove him to the location on Highway 271 and that their struggle began when he noticed Brown had a knife and tried to take it away from her. He also testified that he took her to the hospital because she needed medical care and he was worried about her. In its role as the sole judge of the credibility of the witnesses, *Moore v. State*, 935 S.W.2d 124, 126 (Tex.Crim.App. 1996), the jury chose not to believe his testimony.

3. Although the word "voluntarily" is used in section 20.04(d), we follow the practice of other appellate courts and apply the definition of "voluntary," which is more expansive. *See, e.g., Carreon v. State*, 63 S.W.3d 37, 39–40 (Tex.App.—Texarkana 2001, no pet. h.); *Oestrick v. State*, 939 S.W.2d 232, 239 (Tex. App.—Austin 1997, pet. ref'd); *Teer v. State*, 895 S.W.2d 845, 849–50 (Tex.App.—Waco 1995), *pet. dism'd, improvidently granted*, 923 S.W.2d 11 (Tex.Crim.App.1996).

legally entitled to use.[4]  *Id.*

■ The Court of Criminal Appeals has not defined "voluntary" in this context, although it had an opportunity to do so when it granted the petition for discretionary review in *Teer*.[5] The petition was subsequently dismissed as improvidently granted, but four justices on the Court of Criminal Appeals disagreed with that disposition, concluding that the Waco court had adopted an impermissibly narrow definition of "voluntary" in direct conflict with the Court's decisions in *Vernon v. State*, 841 S.W.2d 407 (Tex.Crim.App. 1992) and *Tyra v. State*, 897 S.W.2d 796 (Tex.Crim.App.1995).[6]  *Teer*, 923 S.W.2d at 12 (McCormick, P.J., dissenting). Their dissenting opinion reaffirmed the method set forth in *Boykin* for determining legislative intent as well as the rule in *Tyra* that words not specially defined by the Legislature should be broadly construed to encompass all definitions that can be understood from common usage. *Id.* at 19. After an extensive review of the definitions of "voluntary" that were possible when the existing rules of construction were applied, the dissent concluded that:

> [A]n act is "voluntary" only if it was the spontaneous product of the actor's free will, uninfluenced by another's persuasion, coercion, or solicitation. Thus, an act may be deemed "involuntary" if the actor's decision to perform the act was the product of or affected by another's interference, persuasion, influence, or quid pro quo offer.

*Teer v. State*, 923 S.W.2d at 20. We agree with the dissent's analysis and its definition of "voluntary."

■ From our reading of section 20.04(d) in light of the relevant principles of construction, we conclude that the meaning of "voluntary" should have been plain to the legislators who voted on the statute and that the definition formulated by the dissent in *Teer*, rather than the definition adopted by the Waco Court of Appeals, is correct. We therefore hold that "voluntary," in the context of section 20.04(d), means "the spontaneous product of the actor's free will, uninfluenced by another's persuasion, coercion, or solicitation."[7]

---

**4.** The current Texas Penal Code was enacted by the 63rd Legislature in 1973 and included a mitigation provision similar to section 20.04(d). Although *Vernon* and *Tyra* were decided two decades later, their holdings are consistent with the mandate that Penal Code provisions be construed "according to the fair import of their terms." TEX. PEN.CODE ANN. § 1.05(a) (Vernon 1994).

**5.** In *Teer*, the Waco Court of Appeals reviewed the sufficiency of the evidence to support a jury finding that a defendant convicted of aggravated kidnapping had not voluntarily released his victim. The court, in deciding the issue, concluded that the legislative purpose of section 20.04(d) is to promote the safe release of kidnapping victims. *Teer*, 895 S.W.2d at 849. To further that purpose, the court held that the ordinary meaning of "voluntary" includes "proceeding from the will or one's own choice or consent," "done by de-

sign or intention," and "having power of free choice." *Id.*

**6.** The Waco Court did not have the benefit of the *Tyra* opinion, which was decided three weeks after *Teer*.

**7.** The definition formulated by the dissent is consistent with the construction of the renunciation statute, TEX. PEN.CODE ANN. § 15.04(a) (Vernon 1994), which is a mitigation provision that applies when a voluntary and complete renunciation of an inchoate crime occurs. In that context, a renunciation is "voluntary" only if it results from a change of heart and not from the influence of other factors. *Thomas v. State*, 708 S.W.2d 861, 864 (Tex.Crim.App.1986); *Chennault v. State*, 667 S.W.2d 299, 303 (Tex. App.—Dallas 1984, pet. ref'd). The mere fact that the renunciation is "complete" is insufficient without the requisite change of heart.

*FACTUAL SUFFICIENCY*

█ Appellant contends that evidence is factually insufficient to support the jury's finding that he did not voluntarily release Brown in a safe place. The State concedes that Mother Frances Hospital is a safe place, but disagrees that the release was voluntary.

### Standard of Review

█ At trial, Appellant had the burden to show by a preponderance of the evidence that he voluntarily released Brown in a safe place. TEX. PEN.CODE ANN. 20.04(d). Because Appellant had the burden of proof, we determine the factual sufficiency of the evidence by considering all the evidence relevant to the issue of voluntary release to determine whether the judgment is so against the great weight and preponderance of the evidence as to be manifestly unjust. *Meraz v. State,* 785 S.W.2d 146, 155 (Tex.Crim.App. 1990).

### The Evidence

Brown and Appellant both gave an account of the incident, and portions of their testimony relate to whether Brown's release was voluntary. Brown testified that Appellant (1) repeatedly denied her requests for medical attention even though she was seriously injured and growing weaker, (2) agreed several times to take her to the hospital, but changed his mind, (3) called his sister to tell her he was taking Brown to the hospital and then made two more telephone calls, (4) proceeded slowly out of the driveway as he made the last call, (5) changed lanes after he turned toward Tyler on Highway 271 as though he planned to turn around and drive in the opposite direction, (6) questioned Brown about whether she would really say she "did it" after she offered to do so if he would take her to the hospital,

and (7) proceeded to the hospital without further delay once Brown assured him she would keep her promise. That testimony supports the jury finding that Appellant did not voluntarily release Brown. The only evidence in the record that conflicts with the jury finding is from Appellant, who testified that he took Brown to the hospital because she needed medical care and he was worried about her.

Based upon our review of the record, we conclude the jury could have reasonably determined that Appellant released Brown because of her promise to conceal the circumstances of her injury and not out of concern for her condition. As a result, the jury finding that Appellant did not voluntarily release Brown is supported by the evidence and is consistent with our definition of "voluntary."

### CONCLUSION

We conclude from our review of the record that the jury finding that Appellant did not voluntarily release Brown in a safe place is not so against the great weight and preponderance of the evidence as to be manifestly unjust. We therefore hold that the evidence is factually sufficient to support the jury's finding and overrule Appellant's sole issue on appeal. The judgment of the trial court is *affirmed.*