Roger Lee LAVARRY, Sr., Appellant,

v.

The STATE of Texas, Appellee.

Nos. 05–94–01595–CR, 05–94–01596–CR.

Court of Appeals of Texas,
Dallas.

Nov. 14, 1996.

Discretionary Review Refused
Feb. 26, 1997.

---

Russ Henrichs, Dallas, George White, Irving, for appellant.

Lori L. Ordiway, Assistant District Attorney, Dallas, for the state.

Before LAGARDE, WRIGHT and WOLFE, JJ.

## OPINION

LAGARDE, Justice.

Roger Lee Lavarry, Sr. appeals his convictions for aggravated kidnapping. After a jury found appellant guilty, the trial court assessed appellant's punishment at fifty years' imprisonment and a $1000 fine in each case. Appellant brings three points of error contending that: (1) the evidence is insufficient to support the trial court's implied finding that appellant did not release the victims voluntarily and in a safe place; (2) the trial court erred in denying appellant's request to charge the jury on the lesser included offense of kidnapping; and (3) the trial court erred in overruling appellant's objection to a prior unadjudicated offense. We overrule appellant's second and third points of error. We sustain appellant's first point of error and remand the causes to the trial court for further proceedings. *See* TEX.CODE CRIM. PROC. ANN. art. 44.29(b) (Vernon Supp.1996).

## FACTUAL BACKGROUND

Appellant and Sandra Roberts had been lovers, and appellant is the father of Roberts' child, Quinton. The couple later ceased to live together. Appellant was convicted of assaulting Roberts on July 24, 1990. On June 1, 1993, after appellant hit Roberts in the face blackening her eye, Roberts obtained a protective order against appellant. In spite of the protective order, appellant "busted [Roberts] in the face" on July 22, 1993. Roberts testified that appellant would telephone her at home and at work threatening her. When her supervisor would not let appellant speak to her, appellant threatened to hurt him. After appellant broke the windows of Roberts' car, her boss, David Williams, kept the car and would pick up Roberts at her apartment to go into work. On July 23, 1993, appellant came to Roberts'

apartment and asked to see Quinton. Roberts told him he could not see Quinton and told him to leave. Appellant then broke a window in Roberts' apartment.

The next morning, Williams arrived to drive Roberts to work. Roberts' children were going to spend the day with Williams' wife. The children came out of the apartment and got in the car. As Roberts was leaving the apartment, appellant pointed a gun at Williams' chest and told Roberts and Williams to go back into the apartment or someone would get hurt. The three of them went inside the apartment leaving the children in the car. After a few minutes, Roberts reminded appellant that the children were still in the car. Appellant went to the door and told the children to come into the house. Roberts' daughter saw the gun and was afraid that appellant would shoot Roberts. Roberts told her that she would be all right and told her and Quinton to watch television.

Appellant held Roberts and Williams at gunpoint for three hours and forty-five minutes. During that time, appellant threatened to kill both of them. He accused them of having a sexual relationship. He then sat next to Roberts, rubbed her leg, and told her, "By the way, just thinking about all this I want some." He threatened to kill Williams for "messing with" his wife. He called Roberts a "dirty bitch" and said he should shoot her for leaving him for Williams. Both Roberts and Williams testified they were afraid that appellant might shoot them.

At some point, appellant told Roberts and Williams that he wanted to go somewhere to kill himself. He told Williams that he was taking Roberts with him. He told Williams not to call the police or he would kill Roberts. He then told Williams that he would not harm Roberts but would send her back to her children after she dropped him off somewhere. Appellant and Roberts left the apartment, got into her car, and drove away.

While Roberts drove, appellant pointed the gun at her side. Appellant told her to take him to his best friend's aunt's house. Appellant kept asking why they could not get back together. Appellant told Roberts that he

ought to let her hold the gun so that her fingerprints would be on it. He then took the bullets out of the gun and placed it in her lap. When they arrived at the house, appellant said, "I told your friend not to call the police, but I know they are already over there. But you haven't heard the last of this. If the police are involved, I'll be back." He told her that "if the police was [sic] involved, we will see him [appellant] again, somebody is going to get hurt." Appellant took back the gun and said, "Hum. Well, I better take this with me because I'm going to need it." He then got out of the car and walked away. Roberts drove home.

Appellant testified that on July 23, 1993, he used the last of his money for a cab ride to Roberts' apartment to ask her to give him some money. When he got there, he unlocked the door with his key, but a chain on the door kept it from opening all the way. Looking through the door, he saw Williams naked in Roberts' apartment. The door was slammed closed in his face. Appellant went to a window. While appellant peered through the window, Williams punched him in the face through the window, breaking it in appellant's face. Appellant then went around the corner and spent the night in a doorway. The next morning, as Williams and Roberts left the apartment, appellant approached them and asked them to take him home. After some conversation involving appellant threatening to tell Williams' wife that Williams was sleeping with Roberts, Roberts agreed to take appellant to his best friend's aunt's house. Appellant denied having a gun with him or kidnapping Roberts or Williams.

## JURY CHARGE

In his second point of error, appellant contends that the trial court erred in denying appellant's requested jury charge on the lesser included offense of kidnapping.

A trial court must submit a charge on a lesser included offense if: (1) the lesser included offense is within the proof necessary to establish the offense charged; and (2) some evidence exists in the record that would permit a jury rationally to find that if the

defendant is guilty, he is guilty *only* of the lesser included offense. *Robertson v. State*, 871 S.W.2d 701, 706 (Tex.Crim.App.1993), *cert. denied,* — U.S. ——, 115 S.Ct. 155, 130 L.Ed.2d 94 (1994). In determining whether the record contains evidence that if the defendant is guilty he is guilty *only* of the lesser offense, we must examine the entire record. *See Rousseau v. State*, 855 S.W.2d 666, 673 (Tex.Crim.App.), *cert. denied,* 510 U.S. 919, 114 S.Ct. 313, 126 L.Ed.2d 260 (1993); *Lugo v. State*, 667 S.W.2d 144, 147 (Tex.Crim.App.1984).

■ If there is evidence from any source raising the issue that the defendant committed a lesser included offense and the defendant requests the issue, the trial court must submit it to the jury. *Robertson*, 871 S.W.2d at 706. If there is some evidence that negates the aggravating element of the greater offense or if the evidence of the aggravating element is so weak that a rational jury might interpret it in such a way to give it no probative value, then the trial court must submit a lesser included charge to the jury. *Id.* The court does not consider the credibility of the evidence or whether it is controverted or conflicts with other evidence in determining whether to submit an instruction on a lesser included offense. *Havard v. State*, 800 S.W.2d 195, 216 (Tex.Crim.App. 1989) (op. on reh'g); *Moore v. State*, 574 S.W.2d 122, 124 (Tex.Crim.App. [Panel Op.] 1978).

■ Aggravated kidnapping requires proof of all the elements for kidnapping as well as proof of an aggravating element. *See* TEX. PENAL CODE ANN. §§ 20.03, 20.04 (Vernon 1994). Thus, kidnapping is a lesser included offense of aggravated kidnapping because kidnapping is within the proof necessary to establish aggravated kidnapping, the offense charged in this case.

■ Appellant asserts that he was entitled to the lesser included offense instruction because Roberts' and Williams' testimony failed to establish appellant's intent to terrorize them. We interpret appellant's brief as asserting that Roberts' and Williams' testimony shows that appellant is guilty, if at all, of kidnapping only and not aggravated kidnapping.

In *Jernigan v. State*, 706 S.W.2d 813 (Tex. App.—Fort Worth 1986, pet. ref'd), the court of appeals held that the fear of anticipated infliction of imminent bodily injury or death caused by a kidnapping ordeal is sufficient to indicate that the defendant intended to terrorize the victim after abducting him. *Id.* at 821; *see id.* at 820 (quoting Practice Commentary to section 20.04: "restraint at gunpoint would no doubt terrorize the victim."); *see also Teer v. State*, 895 S.W.2d 845, 848 (Tex.App.—Waco 1995), *pet. dism'd, improvidently granted,* 923 S.W.2d 11 (Tex.Crim. App.1996). In this case, appellant held Williams and Roberts at gunpoint for three hours and forty-five minutes during which he threatened to kill both of them. Both Williams and Roberts testified they feared that appellant might shoot them. This evidence shows appellant intended to terrorize them. The evidence does not show that appellant did not intend to terrorize them.

■ Appellant testified at trial, but he denied committing any offense. If a defendant presents evidence that he did not commit any offense and there is no other evidence raising an issue, a charge on the lesser included offense is not required. *See San Roman v. State*, 815 S.W.2d 785, 788 (Tex.App.—El Paso 1991, no pet.). Because the record contains no evidence that he is guilty only of kidnapping, we hold that the trial court did not err in denying appellant's request for a jury instruction on the lesser included offense. We overrule appellant's second point of error.

## EXTRANEOUS OFFENSE

■ In his third point of error, appellant contends that the trial court erred in admitting evidence of an unadjudicated extraneous offense. Appellant asserts on appeal that the offense was too remote in time to be admissible and that its probative value was substantially outweighed by its prejudicial effect.

After appellant rested, the State called appellant's wife, Regina Lavarry, to testify on rebuttal. Regina testified that she and

appellant were married and had five children. They then separated. On a Christmas Eve night in the early 1980s, after Regina had put the children to bed, she was assembling the children's toys when appellant arrived with a table and chairs for the children. Appellant had been drinking, but he tried unsuccessfully to help assemble the toys. Appellant asked Regina to have sex with him, but she refused. Appellant then pointed a pistol at her and blocked the door. "[F]or a while," Regina felt trapped by the defendant, but then she walked around him and left her house. She never filed charges against appellant for this incident.

Appellant objected to the evidence of this extraneous offense on the grounds that the offense was too remote and that its probative value was substantially outweighed by its prejudicial effect. The trial court overruled appellant's objections and admitted the evidence. Appellant did not request, and the trial court did, not give the jury, a limiting instruction concerning the extraneous offense at the time it was admitted into evidence. In the jury charge, the trial court instructed the jurors that they could only consider the unadjudicated extraneous offense in determining appellant's "motive, intent, scheme or design, if any, ... in connection with the offense."

In a line of cases predating the current rules of criminal evidence, the court of criminal appeals had held that extraneous offenses committed more than a few years before the charged offense were too remote to be admissible. *See Bachhofer v. State,* 633 S.W.2d 869, 871–72 (Tex.Crim.App. [Panel Op.] 1982); *James v. State,* 554 S.W.2d 680, 683 (Tex.Crim.App.1977); *Robledo v. State,* 480 S.W.2d 401, 402 (Tex.Crim.App.1972); *Ybarra v. State,* 401 S.W.2d 608, 609 (Tex.Crim. App.1966). At least one court has questioned the validity of *Bachhofer* following the enactment of rule of criminal evidence 404. *See Gonzales v. State,* 838 S.W.2d 848, 863 (Tex. App.—Houston [1st Dist.] 1992), *pet. dism'd, improvidently granted,* 864 S.W.2d 522 (Tex. Crim.App.1993). Moreover, each of these cases is distinguishable. In *Bachhofer* and *James,* the court of criminal appeals noted the lack of any intervening circumstances to

validate the remote extraneous offenses. *See Bachhofer,* 633 S.W.2d at 872; *James,* 554 S.W.2d at 683. In this case, the record contains the intervening circumstances of appellant's assaults on Roberts and her property. In *Robledo* and *Ybarra,* the language of those opinions limits their applicability to the particular types of offenses in those cases. *See Robledo,* 480 S.W.2d at 402 ("[E]vidence of other forgeries is admissible ... provided such forgeries were not too remote in point of time." (quoting 25 Tex. Jur.2d *Forgery* § 59)); *Ybarra,* 401 S.W.2d at 609 ("[A] prior conviction for the unlawful sale of liquor must not be remote."). Considering all the facts and circumstances in this case, we conclude that the unadjudicated extraneous offense was not so remote as to bar its admission.

Appellant presents no argument and cites no authorities in support of his assertion that the prejudicial effect of the extraneous offense greatly outweighed its probative value. Appellant has neither briefed this point nor cited any authority in support of his argument. *See* Tex.R.App. P. 74(f). Failure to present argument or cite authority in support of a point of error presents nothing for this Court to review. *Lewis v. State,* 911 S.W.2d 1, 5 n. 8 (Tex.Crim.App.1995); *State v. Gonzalez,* 855 S.W.2d 692, 697 (Tex.Crim. App.1993). We overrule appellant's third point of error.

### VOLUNTARY RELEASE IN A SAFE PLACE

In his first point of error, appellant contends that the trial court erred in sentencing him as a first degree felon because the record shows that he voluntarily released Roberts and Williams in safe places. Under section 20.04(b) of the penal code, aggravated kidnapping is a first degree felony unless the defendant voluntarily released the victim alive and in a safe place, in which case it is a second degree felony. *See* Act of May 24, 1973, 63d Leg., R.S., ch. 399, § 1, 1973 Tex. Gen. Laws 883, 915, *amended by* Act of May 29, 1993, 73d Leg., R.S., ch. 900, § 1.01, 1993 Tex. Gen. Laws 3586, 3615 (codified at Tex. Penal Code Ann. § 20.04(b), (c) (Vernon Supp.1996)).

At the time of trial, the threshold burden of production was on the defendant to introduce evidence showing that he voluntarily released the victim in a safe place. *Williams v. State,* 851 S.W.2d 282, 286 (Tex. Crim.App.1993) (per curiam). Once some evidence of voluntary release in a safe place was introduced from any source, the defendant had met his burden. The burden of persuasion then shifted to the State to convince the factfinder that the place where the accused left his victim was not safe. The factfinder had to find the place unsafe to a level of confidence beyond a reasonable doubt. If the State failed in this burden, the defendant was punished as a second degree felon.[1] *Id.*

Appellant met the threshold burden of production through Roberts' testimony that she and Williams were released in safe places and through Williams' testimony that he was physically safe after his release.

### Safe Place

In determining whether the victim was released in a safe place, we consider the following factors:

(1) the remoteness of the location;

(2) the proximity of authorities or persons who could aid or assist;

(3) the time of day;

(4) climatic conditions;

(5) the condition of the victim;

(6) the character of the location or surrounding neighborhood; and

(7) the victim's familiarity with the location or surrounding neighborhood.

*Rodriguez v. State,* 766 S.W.2d 360, 361 (Tex. App.—Texarkana 1989, pet. ref'd); *Williams v. State,* 718 S.W.2d 772, 774 (Tex.App.—Corpus Christi 1986), *aff'd in part and rev'd in part on other grounds,* 851 S.W.2d 282 (Tex.Crim.App.1993).

In this case, the record shows that the abduction occurred at about seven o'clock in the morning with the complainants released in the late morning. The record does not show that the weather conditions were unfavorable. Williams was released in Roberts' apartment. Roberts was released by appellant leaving her in her car near his best friend's aunt's house. The record shows that Roberts had been to this house many times. Nothing shows that this area, Roberts' car, or Roberts' apartment was an unsafe place. Roberts testified that both she and Williams were released in safe places. Williams testified that he was physically safe but not mentally safe on his release.

The State asserts that appellant's threat to Williams to kill Roberts if he called the police and appellant's threat to Roberts to return and hurt her if she called the police prevented appellant's release of Roberts and Williams from being in safe places. The State's argument appears to be that, when the defendant threatens the victim, no place of release could be a safe place. The problem with the State's argument is that it focuses on the dangerousness of the defendant and the victim's feelings of safety, or lack thereof, instead of the safety of the *place* of release. *See* TEX. PENAL CODE ANN. § 20.04(d) (Vernon Supp.1996). The case law does not support the State's interpretation of the term "safe place."

In *Buchanan v. State,* 881 S.W.2d 376 (Tex.App.—Houston [1st Dist.] 1994), *rev'd on other grounds,* 911 S.W.2d 11 (Tex.Crim. App.1995), the defendant abducted the victim and drove her to the cemetery where her parents were buried. The defendant made the victim stand on the edge of an open grave and told her, "Bitch, that's where they put your mother and father and that's where a bitch like you needs to be at." The defendant then raped the victim three times and drove her to her aunt's house where he released her after again threatening to kill her. The court of appeals stated that "the undisputed evidence presented at the guilt phase of the trial indicates that [the victim] was

---

1. We note that the legislature has changed the burden of proof for offenses occurring on or after September 1, 1994. The burden of proof is now on the defendant to show by a preponderance of the evidence that he voluntarily released the victim in a safe place. *See* Act of May 29, 1993, 73d Leg., R.S., ch. 900, § 1.01, 1993 Tex. Gen. Laws 3586, 3615 (codified at TEX. PENAL CODE ANN. § 20.04(d) (Vernon Supp.1996)).

released at her [aunt's] home, presumably a safe place." *Id.* at 378.

Neither *Buchanan,* other Texas cases, nor cases from other states having a "safe place" element have suggested that threats to kill can transform an otherwise safe place into an unsafe place. Generally, the cases focus on the physical condition of the victim and the nature of the surroundings. *See, e.g., Gibbons v. State,* 652 S.W.2d 413, 414–15 (Tex. Crim.App. [Panel Op.] 1983) (victim not released in safe area when she was pushed out of car onto pavement at night in high-crime area that was not safe for a woman alone at that time of night); *Wiley v. State,* 820 S.W.2d 401, 411 (Tex.App.—Beaumont 1991, no pet.) (victim not released in safe place when beaten moments before release, victim's truck was inoperable, and no medical or police aid was convenient); *Thornburg v. State,* 699 S.W.2d 918, 921 (Tex.App.—Houston [1st Dist.] 1985, no pet.) (victim not released in safe place when victim was ten-year-old girl released twenty-five miles from home in early morning hours in neighborhood that policeman said was not safe for ten-year-old child at that time of morning); *see also Black v. State,* 50 Ark.App. 42, 901 S.W.2d 849, 851–52 (1995) (victim's home not a safe place when she required hospitalization); *State v. Allen,* 112 N.C.App. 419, 435 S.E.2d 802, 807 (1993) (victim used as shield was released in safe place when released in parking lot of police station).

A few cases consider the victim's feelings of safety following the release, but it is never the overriding factor. *See Harris v. State,* 882 S.W.2d 61, 65 (Tex.App.—Houston [14th Dist.] 1994, pet. ref'd) (victim not released in safe area when she had been held for two days without food and water, repeatedly raped, and released at 2:30 a.m. in unsafe neighborhood near deserted gas station in February when it was cold and raining and victim was wearing only a dress and victim testified that she felt unsafe at the place she was left); *Rodriguez v. State,* 766 S.W.2d 360, 361 (Tex.App.—Texarkana 1989, pet. ref'd) (fourteen-year-old victim not released in safe place after she had been raped three times and released at night in February on unfamiliar rural dirt road a few minutes'

walk from gas station and she did not know whether she could obtain aid at gas station); *see also State v. Sutcliff,* 322 N.C. 85, 366 S.E.2d 476, 479 (1988) (victim not released in safe area when released at 5:00 a.m. in January in unfamiliar area and victim could not find shelter until she ran nine-tenths of a mile to shopping center and had to wait alone several minutes until an officer arrived; while en route to mall, victim feared for her safety and hid whenever she saw cars or headlights).

■■■ Thus, the victim's feelings of safety may be a factor in determining the safety of a place, but in no case has it converted an otherwise safe place (like a victim's home or operable car) into an unsafe place. Moreover, both Williams and Roberts testified that they were released in a safe place. After considering the entire record, we conclude that the State failed to prove beyond a reasonable doubt that the places where appellant left Williams and Roberts were not safe.

### Voluntariness

■■■ The State asserts that appellant did not voluntarily release Williams and Roberts because he did so under fear of police apprehension. The State cites *Wiley v. State* for this proposition. *See Wiley,* 820 S.W.2d at 411. In fact, *Wiley* makes no such holding. *See id. Wiley* states that

> an accused, in order to avail himself of the mitigating effect of § 20.04(b), must have performed some overt and affirmative act that brings home to the victim that he/she has been fully released from captivity. That release must occur in a place and manner which realistically conveys to the victim that he/she is now freed from captivity and is now in circumstances and surroundings wherein aid is readily available. . . . It is incumbent upon the State to prove beyond a reasonable doubt that the defendant did not perform those affirmative acts allowing mitigation under § 20.04(b).

*Id.* In this case, appellant performed "overt and affirmative act[s]" "bring[ing] home" to Williams and Roberts that they were fully released from captivity: appellant walked

away from Williams leaving him in Roberts' apartment, and he walked away from Roberts leaving her in her car. These actions should have conveyed to Williams and Roberts that they were fully released from captivity. Under these facts, appellant's threats to return and hurt or kill them if they called the police do not affect the voluntariness of his release.

The State also relies on the following language from *Cortez v. State,* 738 S.W.2d 372 (Tex.App.—Corpus Christi 1987, no pet.), discussing the meaning of the word "hold" in section 20.01(2)(A):

> It appears that an assailant may "hold" his victim under § 20.01(2)(A) by force of threats. Threats are simply one manner in which the victim may be held in a particular location. The assailant creates an environment through both physical force and threats of greater force for not cooperating, which together effectively holds his victim in that location. . . . Similarly, in the present case, threats not to "say anything" were simply the manner in which the appellant created an environment in which the complainant was not likely to be "found"; she was effectively, if not physically, "isolated" by force of threats from anyone who could have been of assistance.

*Id.* at 374 (citations omitted). In *Cortez,* the defendant abducted the victim, badly tortured and beat her, and then took her to his cousin's girlfriend's house to recuperate. The defendant told the victim to think of a good story to explain her injuries and threatened to harm her or her family if she "ever said anything." The victim stayed at this house for a week. During that time, the defendant occasionally left the house without her, but she did not try to escape because of the defendant's threats to hurt her or her family. Visitors stopped by the house, but the victim did not inform them of her abducted status because she was afraid the defendant would hurt her or her family. The court determined that the defendant's threats "held" her in a place where she was not likely to be found. However, the court's discussion concerns only the definition of "abduct"; it has nothing to do with voluntary

release in a safe place. *See id.* Thus, it is not applicable to the issue before us. After considering all the evidence, we conclude that the State failed to show beyond a reasonable doubt that appellant's release of Roberts and Williams was not voluntary.

### Release

■ The State also appears to use *Cortez* to argue that appellant's threats kept Williams and Roberts "restrained" for purposes of section 20.01(1) of the penal code so that he never "released" them even after he walked away from them. Tex. Penal Code Ann. § 20.01(1) (Vernon 1994). This "continuing restraint" theory has several problems. Appellant threatened Williams that he would kill Roberts if Williams called the police. Under the continuing-restraint theory, Williams stayed restrained until Roberts returned to the apartment, at which time, appellant's threat to kill Roberts could be of no immediate effect. Thus, appellant's act of allowing Roberts to return to her apartment "released" Williams. Because appellant voluntarily let Roberts return to her apartment, he voluntarily released Williams from all restraint. Under the continuing-restraint theory, Roberts, however, would continue to be restrained until appellant was arrested months later. This release from restraint would be involuntary because it was caused by appellant's arrest.

However, the flaw in this continuing-restraint theory is that the statute defines "restrain" as meaning "to restrict a person's movements without consent, so as to interfere *substantially* with his liberty, by moving him from one place to another or by *confining* him." Tex. Penal Code Ann. § 20.01(1) (Vernon 1994) (emphasis added). In this case, appellant's threats attempted to limit Roberts' and Williams' liberty in only one regard—they were not to contact the police. We question whether such a threat could ever constitute a substantial interference with a person's liberty by confining him. However, even if this limitation on Roberts' and Williams' actions could be interpreted as a substantial interference with their liberty by confinement, the record is clear that it had no effect on Roberts' and Williams' liberty. Williams called the police immediately

after appellant left with Roberts, and Roberts spoke to the police immediately after she returned to her apartment. No interpretation of the record permits us to conclude that appellant's threats substantially interfered with Roberts' and Williams' liberty by confining them.

After considering the entire record, we must conclude that the evidence is insufficient to support the trial court's implied finding that appellant did not voluntarily release Williams and Roberts in safe places.[2] We sustain appellant's first point of error in each case.

We reverse the trial court's judgments and remand the causes for further proceedings consistent with this opinion. *See* TEX.CODE CRIM. PROC. ANN. art. 44.29(b) (Vernon Supp. 1996).

2. Although the record is less than clear on the trial court's resolution of this issue, both sides argue that it is necessarily implied by the trial court's sentences in these cases. Our opinion is written accordingly.