

# In The
# Court of Appeals
# Sixth Appellate District of Texas at Texarkana

_____

## No. 06-09-00080-CR

_____

ADAM BRANDON CREWS, Appellant

V.

THE STATE OF TEXAS, Appellee

On Appeal from the 336th Judicial District Court
Fannin County, Texas
Trial Court No. 22574

Before Morriss, C.J., Carter and Moseley, JJ.
Memorandum Opinion by Justice Moseley

MEMORANDUM OPINION

After having been convicted by a jury of aggravated kidnapping[1] and having been assessed a penalty of fifteen years' imprisonment, Adam Brandon Crews has prosecuted an appeal. We affirm the judgment of the trial court.

## I.    FACTUAL AND PROCEDURAL BACKGROUND

Crews was involved in an intermittent dating relationship with Stephanie Friedman for about five years, a relationship which, in 2005, produced a child. The relationship between Crews and Friedman was alternately filled with conflict and, by December 2006, the relationship was once again on rocky ground, causing Friedman to choose to terminate the relationship. Crews, being unwilling to part, sought to have an opportunity for the couple to work out their problems and reconcile. Toward this end, he convinced Friedman to spend a weekend with him at a house in Ladonia owned by Crews's family. Friedman willingly accompanied Crews on the weekend retreat. The occurrences during that planned weekend retreat form the basis for the criminal complaint against Crews.

According to Friedman, once the couple arrived at the house in Ladonia, Crews's demeanor changed from the mythical Dr. Jekyll and he became a virtual Mr. Hyde, becoming demanding and violent, and insisting that Friedman resume their relationship. When Friedman refused, Crews turned the anticipated weekend of bliss into a two-day hell of domination and verbal, physical, and

---

[1]Tex. Penal Code Ann. § 20.04 (Vernon 2003).

2

emotional abuse. Crews refused to release her or return her to her home and confiscated Friedman's cell phone so she could not call for help. Friedman was denied food and drink throughout the weekend.[2]

On Friday evening, although Crews drove Friedman to the store for cigarettes, he made certain that she did not get out of his sight. Upon returning from the store, Friedman's insistence that she wanted to return home infuriated Crews and he repeatedly insisted that she stay because the two of them needed to "resolve this." Faced with her recalcitrance, Crews began yelling at Friedman and he went into the kitchen and broke all of the dishes, all the while cursing Friedman. After Crews calmed down, he returned to the kitchen to clean up the broken dishes.

Sensing that his cleanup work provided her with an opportunity to escape, Friedman ran for the back door, at which point Crews grabbed her from behind, picked her up, and threw her into a wooden chair in the living room and yelled at Friedman to "stay." Crews then left the room and returned with a handgun, which he first placed to his head and threatened suicide and then with which he threatened to kill Friedman. Crews put the gun away when Friedman acquiesced and agreed not to leave Crews.

Unconvinced of Friedman's willingness to stay with him, Crews began to pinch and twist the skin on Friedman's arms, then grabbed her by the hair and yanked her from the chair to the floor. Crews then told Friedman he would show her how much he loved her; he grabbed her and carried

---

[2]The couple left Greenville for Ladonia in the late afternoon on a Friday; Crews returned Friedman to her home on Sunday afternoon.

her to the bedroom, where he threw her onto the bed and molested her, ceasing only after repeated pleas from Friedman.

On Saturday, although the physical violence ceased, Friedman was still not free to leave and she was repeatedly told by Crews that she (not he) bore the entire blame for the situation. On Sunday morning (December 10), Crews asked Friedman if she was ready to go home. When Friedman indicated that she wanted to go home (as she requested numerous times on Friday and Saturday), Crews drove Friedman from Ladonia to her home in Greenville. During the trip to Greenville, Crews continued to blame Friedman and threatened to "take away everything that [Friedman] love[d]" if Friedman ever told anyone of the events in Ladonia.

Despite the events of the weekend of December 8 through 10, 2006,[3] Friedman and Crews continued in their dating relationship. Friedman and her daughter with Crews, Kenzie, spent Christmas Eve at the Crews's home that year.[4] Finally, in February 2007, Friedman (with the help and moral support of a friend, April Schodowski[5]) reported the bizarre activities of the December weekend to Fannin County law enforcement officers. Friedman obtained a protective order against

---

[3]Friedman initially testified the events described here took place on the weekend before Christmas in 2006; she then testified that it could have been earlier in the month. Finally, with the assistance of cell phone records, Friedman determined the weekend to have been December 8 through 10, 2006.

[4]Crews lived with his parents in 2006.

[5]Schodowski is a former girlfriend of Adam Crews. Crews contends Schodowski influenced and manipulated Friedman into filing charges against him in retribution for Crews's and Schodowski's broken relationship.

Crews in March 2007. Fannin County law enforcement authorities investigated Friedman's complaint and obtained a voluntary noncustodial statement from Crews.[6]

Despite the past history between them, Friedman resumed her dating relationship with Crews in August 2008, and Friedman wrote a letter requesting that the charges against Crews be dropped. In that letter, she maintained that she had been manipulated and influenced by Schodowski to press charges against Crews and obtain a protective order.[7] During this period of reconciliation, Friedman made a gift to Crews of nude photographs of herself. Crews introduced these photographs at trial. Friedman testified that she never anticipated, when she gave Crews the photographs, that he would use them against her.

By January 2009, the relationship between Friedman and Crews had once again disintegrated and Crews made various threats to Friedman, suggesting alternately that she should leave the State because he was going to come after her, that she should kill herself, and that Kenzie would become a ward of the State after "Mommy's . . . gone."

## II. ISSUES ON APPEAL

Crews raises five issues on his appeal, maintaining that (1) the evidence is not legally sufficient to support conviction; (2) the evidence is factually insufficient to support conviction;

---

[6]The statement was given in March 2008. An audio recording of the statement was introduced over Crews's objection at trial.

[7]At trial, however, Friedman testified against Crews. She no longer claimed she was manipulated to do anything.

(3) the trial court erred in allowing the admission of extraneous misconduct evidence; (4) the trial court erred in admitting into evidence an audio recording of Crews's noncustodial interrogation by police; and (5) if none of the alleged errors were sufficient by themselves to cause his conviction to be reversed, the doctrine of cumulative error requires reversal.

## III. ANALYSIS OF POINTS OF ERROR

### A. Legal and Factual Sufficiency of the Evidence

Crews claims that the evidence is both legally and factually insufficient to support conviction.

In reviewing the legal sufficiency of the evidence, we view the evidence in the light most favorable to the verdict and determine whether any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *Johnson v. State*, 23 S.W.3d 1, 7 (Tex. Crim. App. 2000); *Laster v. State*, 275 S.W.3d 512, 517 (Tex. Crim. App. 2009). In a legal sufficiency review, we must defer to the jury's ability to resolve conflicts in testimony, weigh the evidence, and draw reasonable inferences from the evidence. *Hooper v. State*, 214 S.W.3d 9, 13 (Tex. Crim. App. 2007).

In contrast to a legal sufficiency review, when conducting a factual sufficiency review, all evidence is viewed in a neutral light, favoring neither party. *Steadman v. State*, 280 S.W.3d 242, 246 (Tex. Crim. App. 2009); *Watson v. State*, 204 S.W.3d 404, 414 (Tex. Crim. App. 2006). We are to determine if the evidence supporting the verdict, although legally sufficient, is nevertheless so weak

that the verdict is clearly wrong or manifestly unjust or whether the verdict is against the great weight and preponderance of the conflicting evidence. *Watson*, 204 S.W.3d at 414–15.

While a factual sufficiency review allows a very limited degree of "second-guessing" the jury, the review should be deferential, maintaining a high level of skepticism about the jury's verdict before a reversal can occur. *Roberts v. State*, 220 S.W.3d 521, 524 (Tex. Crim. App. 2007); *Watson*, 204 S.W.3d at 417.

We are directed that a review of both the legal sufficiency and the factual sufficiency of the evidence should be measured by the elements of the offense as defined by a hypothetically-correct jury charge. *Grotti v. State*, 273 S.W.3d 273 (Tex. Crim. App. 2008); *Malik v. State*, 953 S.W.2d 234, 240 (Tex. Crim. App. 1997). Such a charge accurately sets out the law, is authorized by the indictment, does not unnecessarily increase the State's burden of proof or unnecessarily restrict the State's theories of liability, and adequately describes the particular offense for which the defendant was tried. *Villarreal v. State*, 286 S.W.3d 321 (Tex. Crim. App. 2009); *Malik*, 953 S.W.2d at 240. Crews argues neither that the charge is incorrect nor one not authorized by the indictment; it tracks the indictment and the statute that criminalizes the conduct involved.

In order to sustain a conviction for aggravated kidnapping, the evidence must demonstrate that: (1) Crews (2) intentionally or knowingly abducted Friedman (3) either with the intent to terrorize her or while using or exhibiting a deadly weapon during the abduction or with the intent

7

to inflict bodily injury[8] or to violate or abuse Friedman sexually. TEX. PENAL CODE ANN. § 20.04(a)(4), (5), (b).

"Abduct" means to restrain a person with intent to prevent that person's liberation by either secreting the abductee in a place where the abducted person is not likely to be found or by using or threatening to use deadly force. TEX. PENAL CODE ANN. § 20.01(2)(A), (B) (Vernon Supp. 2009). In order to prove abduction in this case, it was the burden of the State to demonstrate that Crews restricted Friedman's movements by either of the above means.

The term "terrorize" is not defined by the Texas Penal Code. However, sister courts in this State have adopted the dictionary definition that this term means "to fill with intense fear or to coerce by threat or force." *Rodriguez v. State*, 646 S.W.2d 524, 527 (Tex. App.—Houston [1st Dist.] 1982, no pet.).

Crews's legal and factual insufficiency claims are based on the premise that the State failed to establish that he abducted Friedman. It is true that Friedman acknowledged that she had been to the house in Ladonia with Crews on numerous weekends in order for Crews to spend time with Kenzie, their daughter. Crews argues that the evidence demonstrates that not only did Friedman voluntarily agree to accompany him to the house in Ladonia during the December weekend, but the fact that she had opportunities to leave (both while she was at the house and when she was at the store where he took her to buy cigarettes), but did not do so is evidence that she was not held against

---

[8]"Bodily injury" means "physical pain, illness, or any impairment of physical condition." TEX. PENAL CODE ANN. § 1.07(8) (Vernon Supp. 2009).

her will. Crews further points out that the only evidence of what took place on the weekend in question was the testimony of Friedman, calling attention to the lack of evidence of bruising or injuries Friedman claimed to have received during the weekend. He further stresses the lack of any independent witness accounts that Friedman and Crews were together at the house in Ladonia on any weekend in December 2006.

In addition, Crews points to evidence that Schodowski (who was instrumental in convincing Friedman to file the criminal charges and pursue the issuance of a protective order against Crews) was a former girlfriend of Crews. Crews then posits that this conduct by Schodowski was prompted by a pursuit of a vendetta on her part against Crews. In an alternative scenario, Crews's mother, Betty Crews, testified that Friedman wanted the relationship with Crews to work out and when it failed, Friedman made the allegations against her son as a spurned woman seeking revenge against Crews.

Finally, Crews contends that because Friedman and Crews reunited on more than one occasion after the December 2006 incident about which Friedman complains, and because Friedman freely provided Crews with nude pictures of herself after that time when they resumed their dating relationship, the evidence against Crews is so undeniably weak that a conviction for aggravated kidnapping was clearly wrong and manifestly unjust.

The record likewise contains evidence which, if true, demonstrates that although Friedman willingly accompanied Crews to Ladonia, she was then restrained there against her will when Crews

refused to take her home and physically prevented her from leaving the residence. Thus, there is evidence that Crews restricted Friedman's movements and restrained her liberty by the use of threats of physical force and that Crews exhibited a deadly weapon (a handgun) during this period of restraint. *See* TEX. PENAL CODE ANN. § 20.01(1), (2)(A) (Vernon Supp. 2009). As pertains to the element of whether Crews had the intention to terrorize Friedman, "One's acts are generally reliable circumstantial evidence of one's intent." *Rodriguez*, 646 S.W.2d at 527. The fear of anticipated infliction of imminent bodily injury or death is sufficient to indicate an intent to terrorize. *Teer v. State*, 895 S.W.2d 845, 848 (Tex. App.—Waco 1995), *pet. dism'd*, *improvidently granted*, 923 S.W.2d 11 (Tex. Crim. App. 1996).

When the entirety of the evidence is viewed in the light most favorable to the verdict, a rational finder of fact could have found the essential elements of the crime of aggravated kidnapping beyond a reasonable doubt. We, therefore, find the evidence to be sufficient to sustain the conviction under a legal sufficiency review.

We further find the evidence in this case to be factually sufficient to support the verdict. Texas law establishes that the jury is the judge of fact in a criminal proceeding.[9] Accordingly, we are to defer to the jury's resolution of questions of conflicting evidence. Moreover, when the evidence is in "fair equipoise" (meaning that a rational juror could either find for or against a

---

[9]*See* TEX. CODE CRIM. PROC. ANN. art. 36.13 (Vernon 2007), art. 38.04 (Vernon 1979).

10

proposition), any one of the conclusions should be upheld by a reviewing court. *Goodman v. State*, 66 S.W.3d 283, 286 n.4 (Tex. Crim. App. 2001).

While Friedman's testimony alone is sufficient to establish the crime of aggravated kidnapping beyond a reasonable doubt, the record contains corroborative evidence of this testimony as well. Although an important part of Crews's defense centered around the contention that he and Friedman had not gone to Ladonia on the weekend that she claimed the offenses had taken place, the record reflects that Melissa Earle, a friend of Friedman, testified that she watched Kenzie for the weekend while Friedman and Crews went to Ladonia. In addition, Schodowski testified that Friedman confided in her after the kidnapping and that Schodowski assisted Friedman in filing criminal charges in Fannin County.

Finally, Friedman's testimony was corroborated by the December 2006 records of Crews's cell phone activities. Whereas Crews's cell phone records revealed that there had been numerous calls both to and from Friedman's number during the first, third, and fourth weekends of December, they showed a distinctly different pattern on the weekend of December 8, 9, and 10. On Friday, December 8, all calls between Friedman and Crews ceased after 5:49 p.m. and those calls did not resume until 2:08 p.m. on Sunday, December 10. This is consistent with Friedman's testimony that Crews picked her up on that Friday evening, deprived her of her cell phone once they reached Ladonia, and did not return the cell phone until he returned her home the following Sunday afternoon.

11

Friedman's trial testimony was consistent with her statement given to peace officers almost two years prior to trial. Although Crews chose to not testify, the jury was permitted to watch his recorded interview with law enforcement officers. Having listened to all of the evidence, it was the jury's task to weigh this evidence and draw all reasonable inferences therefrom. *Arzaga v. State*, 86 S.W.3d 767, 778 (Tex. App.—El Paso 2002, no pet.). The trier of fact is free to believe or disbelieve part or all of a witness's testimony. *Jones v. State*, 984 S.W.2d 254, 258 (Tex. Crim. App. 1998). We will not second-guess the jury on its determination, as great deference is to be accorded the verdict. *Roberts*, 220 S.W.3d at 524. Here, the evidence in support of the verdict is neither so weak that the verdict is clearly wrong or manifestly unjust, nor is the jury's finding against the great weight and preponderance of the conflicting evidence. The evidence is factually sufficient to support the conviction.

We overrule Crews's legal insufficiency and factual insufficiency points of error.

**B.      Extraneous Misconduct Evidence**

Crews complains of the admission of extraneous misconduct evidence. The evidence in question pertains to (1) other crimes with which Crews had been charged in Dallas and in Tarrant County with similar crimes against other women and (2) the history of abusive and threatening behavior with Friedman, pre-dating the December 2006 weekend. We will address the extraneous Dallas and Tarrant County crimes in the section below, as the jury was informed of that information

12

via the recorded interview of Crews by Wayne Walker, an investigator for the Fannin County Sheriff's Office.

The decision to admit or exclude evidence is reviewed under an abuse of discretion standard. *Weatherred v. State*, 15 S.W.3d 540, 542 (Tex. Crim. App. 2000). An abuse of discretion occurs when the trial court acts "without reference to any guiding rules and principles." *Montgomery v. State*, 810 S.W.2d 372, 380 (Tex. Crim. App. 1990). Said another way, a trial court abuses its discretion when it acts arbitrarily and unreasonably. *Reynolds v. State*, 227 S.W.3d 355, 371 (Tex. App.—Texarkana 2007, no pet.). So long as the court's ruling lies within the zone of reasonable disagreement, it will not be disturbed on appeal. *Salazar v. State*, 38 S.W.3d 141, 153–54 (Tex. Crim. App. 2001).

Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith. TEX. R. EVID. 404(b); *Montgomery*, 810 S.W.2d at 386 (op. on reh'g). However, extraneous offense evidence which is relevant apart from its tendency "to prove the character of a person in order to show action in conformity therewith" may be admissible. TEX. R. EVID. 404(b).[10] So long as such evidence "logically serves 'to make . . . more

_____

[10]Rule 404(b) provides that:

> Evidence of other crimes, wrongs or acts is not admissible to prove the character of a person in order to show action in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident. . . .

TEX. R. EVID. 404(b).

13

probable or less probable' an elemental fact; where it serves 'to make . . . more probable or less probable' an evidentiary fact that inferentially leads to an elemental fact; or where it serves 'to make . . . more probable or less probable' defensive evidence that undermines an elemental fact," it is admissible. *Montgomery*, 810 S.W.2d at 387. The determination of whether extraneous-offense evidence has relevance apart from character conformity as required by Rule 404(b) is a question for the trial court. *Moses v. State*, 105 S.W.3d 622, 627 (Tex. Crim. App. 2003). The trial court is to be accorded the same deference in making this determination as it is in making any other relevancy determination. *Montgomery*, 810 S.W.2d at 391.

At trial, the State offered evidence of five instances of extraneous misconduct under Rule 404(b)[11] to show Crews's intent to inflict bodily injury, violate, or abuse Friedman sexually or to

---

[11]The extraneous misconduct evidence was introduced in the form of testimony from Friedman, and included a recount of several incidents which had previously taken place between Crews and Friedman. On one such occasion, Crews was driving with Friedman as his passenger when he pulled in front of an eighteen-wheeler truck as if to hit it head on. Crews did this because Friedman refused to tell him that she loved him and wanted to be with him. After Friedman told Crews what he wanted to hear, he pulled the car back into its rightful lane of traffic. During that same escapade, Friedman, still terrorized over the near head-on collision, asked Crews if he was going to kill her. Crews replied that if he was going to kill her, he would pull onto a dirt road. Shortly thereafter, Crews pulled his car onto a dirt road. During the ordeal in the car, Friedman attempted to escape by opening the passenger door and running on two different occasions. Each time, Crews pulled Friedman back inside of the car by grabbing her arm, shirt, or hair. Crews kept Friedman hostage in his car for several hours.

Another such incident about which Friedman was permitted to testify involved an argument between Friedman and Crews at Friedman's apartment. The argument escalated when Friedman told Crews to leave. At that point, Crews locked the doors of the apartment and stated that he was going to "'F' something up in the apartment." Friedman thought Crews was referring to her. Crews then spit in her face, and Friedman ran to the other room where Crews restrained her on the bed and threatened her with a knife.

terrorize her. The trial court initially sustained Crews's Rule 404 objection to the introduction of this evidence. Crews then cross-examined Friedman, and in doing so, questioned her in detail about the incidents that occurred during the weekend in Ladonia and about the letter written by Friedman asking that charges against Crews be dropped (and claiming she was manipulated by Schodowski into filing the charges). The State then re-offered the extraneous offense testimony to show intent[12] and motive[13] as well as to rebut the defensive theory of manipulation or fabrication regarding the events that occurred in Ladonia, as such events were claimed to be (1) either a complete fabrication on the part of Friedman or (2) the result of the manipulation of Friedman by Schodowski to invent the claimed occurrences as retaliation against Crews. Again, Crews objected on the basis of Rules 403 and 404 of the Texas Rules of Evidence. TEX. R. EVID. 403, 404. The court admitted the

On yet another occasion, Crews told Friedman that he killed eight people for breaking into his house. He told Friedman that he stalked them, found them, and killed each one of them. Around the same time, Crews told Friedman that he was violent and that he would be violent with her. Finally, Friedman testified that Crews threatened to kill himself in front of Kenzie. This threat was made after Friedman told Crews that she did not want to be with him.

[12]The evidence was offered to prove Crews's intent at the time the abduction took place. The State conceded that intent to commit bodily injury or to terrorize or sexually abuse can be inferred when those acts occur; because intent must be present at the time of abduction, however, the State maintained that the prior offenses are indicative of intent to commit those acts prior to or at the time of the abduction.

[13]The State's primary motive theory was Crews's exhibition of similar behavior in the past to force a reconciliation with Friedman. The secondary motive theory was Crews's exhibition of similar behavior in the past in retaliation for Friedman's perceived unfaithfulness and to control Friedman. Thus, it can be inferred that Crews's motive in the kidnapping was to force a reconciliation with Friedman, to retaliate against her, and to force Friedman to remain under his control.

15

evidence on the rationale that (1) such evidence is probative of the intent to terrorize and (2) such evidence rebuts the defensive theory of fabrication or manipulation.

Evidence of extraneous misconduct is admissible to show an individual's culpable mental state at the time of the offense if such mental state cannot be inferred from the conduct itself. *Morgan v. State*, 692 S.W.2d 877, 880 (Tex. Crim. App. 1985). The ultimate issue in a kidnapping offense is the abduction of the victim, i.e., the result. *See Phillips v. State*, 597 S.W.2d 929, 936 (Tex. Crim. App. [Panel Op.] 1980). Therefore, the offense of kidnapping is a result-oriented offense. *Gonzales v. State*, 270 S.W.3d 282, 288 (Tex. App.—Amarillo 2008, pet. ref'd). By extension, aggravated kidnapping is also a result-oriented offense which raises the level of culpability in a kidnapping by the addition of an aggravating circumstance, a specific intent defined by statute, being present at the time of the abduction. *Id*. In this regard, the statute requires the presence of a culpable mental state at the time of the abduction.[14] *Phillips*, 597 S.W.2d at 936. Abduction occurs when a person is restrained with intent to prevent her liberation by secreting or holding her in a place where she is not likely to be found or by using or threatening to use deadly force.[15] Here, Friedman was restrained without her consent when Crews confiscated her cell phone and refused to take her home after having been requested to do so. The intent to terrorize, harm, or

---

[14]The requirement of intentional and knowing conduct at the time of the abduction is clear: "(a) A person commits an offense if he intentionally or knowingly abducts another person with the intent to: . . . (4) inflict bodily injury on him or violate or abuse him sexually; (5) terrorize him or a third person; . . . ." TEX. PENAL CODE ANN. § 20.04 (Vernon 2003).

[15]TEX. PENAL CODE ANN. § 20.01(2)(A), (B).

16

abuse Friedman must have been present prior to or at this particular time. The State bore the burden of proof beyond a reasonable doubt to show the requisite intent at the time of the abduction. This is not a scenario in which intent at the time of abduction can be inferred from the ultimate commission of bodily injury, sexual abuse, or the infliction of terror upon Friedman, as those actions had yet to occur. Thus, evidence of extraneous misconduct prior to the abduction is relevant apart from showing character conformity because it makes more probable the elemental fact of Crews's intent at the time of the abduction. *See Montgomery*, 810 S.W.2d at 387.

The extraneous misconduct evidence was further admitted to rebut the defensive theory of fabrication or manipulation. The Texas Court of Criminal Appeals recently decided, in *Bass v. State*, 270 S.W.3d 557 (Tex. Crim. App. 2008), that extraneous offense evidence may be admitted to rebut a fabrication defense. *Bass* involved the conviction of a church pastor for indecency with a child. The allegations were denied as never having occurred. Extraneous offense evidence that Bass molested two other girls on church property was admitted on the theory that such evidence tended to rebut the defensive theory of fabrication. *Id.* at 562–63. The court in *Bass* reasoned that "[i]t is subject to reasonable disagreement whether this extraneous-offense evidence made these defensive theories less probable." *Id.* at 563 (citing *Powell v. State*, 63 S.W.3d 435, 438 (Tex. Crim. App. 2001)) (issue turns on whether extraneous offense evidence has noncharacter-conformity relevance by rebuttal of defensive theory or making less probable defensive evidence that undermines an elemental fact). Here, the issue of whether the extraneous misconduct evidence made more or less

17

probable Crews's defensive theory of fabrication or manipulation is, at the least, subject to reasonable disagreement. Because the evidence of extraneous misconduct was probative of issues other than character conformity, it was admissible, assuming Rule 403[16] does not otherwise bar its admission. *See Morgan*, 692 S.W.2d at 880.

Regarding the application of Rule 403 to extraneous misconduct evidence, it has been reasoned that "the greater the State's need to resort to extraneous offenses to prove up some material issue in the case, the higher will be the probative value of that offense in relation to its potential for prejudice." *Id.* at 880 n.3. The State's need here is fairly substantial since, whether contested or not, the requisite intent element of the offense must be proved beyond a reasonable doubt. Here, intent can be inferred from the acts of abuse, assault, and the terrorizing of Friedman, but not necessarily at the time of the abduction. Where intent cannot be inferred from the act itself (and specifically at the time the intent must exist), intent will almost always have to be established by showing the commission of similar acts. Intent may then be inferred from the fact that such acts are repeated. *Id.* The evidence of extraneous misconduct in this case naturally leads to the heightened probability of the essential element of intent. This factor militates in favor of admission of the evidence. *Santellan v. State*, 939 S.W.2d 155, 169 (Tex. Crim. App. 1997) (citing *Montgomery*, 810 S.W.2d at 389–90).

---

[16]Rule 403 provides: "Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, or needless presentation of cumulative evidence." TEX. R. EVID. 403.

When one considers Friedman's testimony which described in great detail the nightmarish events of the weekend in Ladonia, it is doubtful that the evidence of extraneous misconduct had the potential of impressing the jury in "some irrational but nevertheless indelible way." *Santellan*, 939 S.W.2d at 169. We further note that only a small percentage of the time expended in the four-day jury trial was devoted to mention of the extraneous offenses. This factor also militates in favor of admission of the extraneous misconduct evidence.

Finally, and as discussed above, the extraneous misconduct evidence is probative of Crews's intent to terrorize, sexually abuse, and inflict bodily injury upon Friedman. Because the trial court's decision to admit the extraneous offense evidence is within the zone of reasonable disagreement, there was no abuse of discretion.

This point of error is overruled.[17]

---

[17]Crews objected to the admission of the extraneous misconduct evidence, but failed to request a limiting instruction at the introduction of the evidence. A party opposing evidence has the burden of requesting the limiting instruction at the introduction of the evidence. *Hammock v. State*, 46 S.W.3d 889, 894 (Tex. Crim. App. 2001). When evidence admissible for a limited purpose is admitted and no limiting instruction is requested, the evidence is admitted for all purposes. TEX. R. EVID. 105(a); *Hammock*, 46 S.W.3d at 893 ("[I]n the absence of such request[,] the court's action in admitting such evidence without limitation shall not be a ground for complaint on appeal."). In this case, a limiting instruction was included in the charge; such was not warranted as the evidence of extraneous misconduct was admitted for all purposes. *Hammock*, 46 S.W.3d at 895.

## C.    Crews's Noncustodial Interrogation

In March 2008, Crews gave a noncustodial, voluntary statement to Walker, an investigator with the Fannin County Sheriff's Office. The evidence, a video recording of the interview, was admitted over Crews's objections. The dialogue leading to the introduction of this piece of evidence was relatively short:

> [THE STATE]:  I'll offer State's 18, Your Honor.
>
> [DEFENSE COUNSEL]:  I am going to object to the admission of this evidence, interview made without an attorney.  There is no indication that he was advised of his rights not to make this statement.  It was an out-of-court statement.  It is not offered in an attempt to impeach the defendant's statement.  It is irrelevant.  It is immaterial.
>
> THE COURT:  Mr. Setterberg, what's the State's response as to the defendant's objection as to 38.22 or 38.23 being given?
>
> [THE STATE]:  I'll proffer some more testimony, if I may, Your Honor.
>
> THE COURT:  Okay.  If that's the only objection, I will sustain at this time.  If you will --
>
> . . . .
>
> [Video recording was reviewed]
>
> THE COURT:  -- do you have any other information that you want the Court to review?  I've only watched it for probably five, ten minutes, but from the first part of the exhibit, it's apparent the 38.22 --
>
> [DEFENSE COUNSEL]:  Yes, Your Honor.

THE COURT: -- warning was given and the defendant affirmatively indicated he did want to waive his rights and visit with the law enforcement, and I believe that was --

[DEFENSE COUNSEL]: I have nothing else.

THE COURT: Okay. Then we are going to give you all the balance of the break that we gave to the jurors . . . .

Crews argues that because a relevance objection was made to the entire exhibit (as opposed to the portions referring to extraneous offenses), the proponent must satisfy the trial court that the extraneous offense evidence has relevance apart from its character conformity value. However, Crews never brought to the attention of the court the fact that the recorded interview included conversations and statements regarding Crews's prior arrest in 2001 in Dallas for a domestic disturbance and in 2002 in Tarrant County for aggravated assault. Nor did Crews bring to the trial court's attention the fact that Walker referred to the prior arrests several times in the interview and stated that Crews was guilty because of the similarities in this case to the charges in Dallas and Tarrant County. Walker also made the following statements during the interview: "So what you are telling me is that you have a history for this?"; that "you were charged for basically the same thing in Tarrant County"; and that "the statistical chances" of Stephanie Friedman and other women lying are "astronomical."

During the course of the interview, Walker told Crews that he reviewed the police report from the Tarrant County case and that Friedman's written statement "looks just like the offense report from Tarrant County." Walker went on to say that Friedman would not have received a

21

protective order against Crews unless her statements were true because it "is impossible for someone like Stephanie to make up what is in her statement."

Finally, Walker made the statement several times during the course of the interview that Crews exhibited "signs of deception."

On appeal, Crews complains of (1) the admission of extraneous offense evidence via the recorded interview, in which Crews's previous charges in domestic matters were discussed and (2) the purported expert testimony of Walker, whose statements and comments about the "signs of deception" concern specialized knowledge, thereby implicating Rule 702 of the Texas Rules of Evidence. *See* TEX. R. EVID. 702.

At trial, however, none of these statements or conversations were brought to the court's attention when the State sought to admit the recorded interview into evidence. Rather, Crews's primary objection was that he was not advised of his right to counsel or of his right to remain silent prior to giving the statement. The court reviewed the first five to ten minutes of the interview and determined that Crews was, in fact, advised of his rights.[18]

When the court specifically inquired about other information the defense wanted the court to review, no additional information was forthcoming. The essential question, therefore, is whether the objection to the introduction of the recorded interview as hearsay, and as irrelevant and

_____

[18]It is apparent from the record that the trial court admitted the interview once it was determined that Crews was fully advised of his rights; the record does not indicate, however, that Crews obtained a ruling on his objections of hearsay, immateriality, and relevancy.

immaterial was sufficiently specific to preserve for review (1) the issue of whether the statement contained inadmissible information regarding prior convictions and statements by Walker that Crews's actions in this case were in conformity with his past behavior, as reflected by the Tarrant County case, and (2) the issue of whether Walker's repeated statements concerning the "signs of deception" was inadmissible expert testimony under Rule 702 of the Texas Rules of Evidence. Crews relies on *Montgomery*, 810 S.W.2d at 387, for the proposition that if an opponent of extraneous offense evidence objects on grounds of relevancy, the proponent of the evidence must then satisfy the trial court that the extraneous offense evidence has relevance apart from its character conformity value.

Rule 33.1(a) of the Texas Rules of Appellate Procedure provides that a complaint is not preserved for appeal unless it was made to the trial court "by a timely request, objection, or motion" that "stated the grounds for the ruling that the complaining party sought from the trial court with sufficient specificity to make the trial court aware of the complaint, unless the specific grounds were apparent from the context."[19] Likewise, under Rule 103 of the Texas Rules of Evidence, error may not be predicated upon a ruling which admits or excludes evidence unless "a timely objection or motion to strike appears of record, stating the specific ground of objection, if the specific ground was not apparent from the context."[20]

---

[19]TEX. R. APP. P. 33.1(a).

[20]TEX. R. EVID. 103(a)(1).

23

The policies underlying the requirement of specific objections are: (1) to inform the trial judge of the basis of the objection to permit the judge to make a ruling; and (2) to provide opposing counsel an opportunity to respond to the complaint. *Resendez v. State*, No. PD-0917-08, 2009 WL 3365656 (Tex. Crim. App. Oct. 21, 2009); *Zillender v. State*, 557 S.W.2d 515, 517 (Tex. Crim. App. 1977). There are no technical considerations or form of words to be used to preserve error on appeal. "[A]ll a party has to do to avoid forfeiture of a complaint on appeal is to let the trial judge know what he wants, why he thinks himself entitled to it, and to do so clearly enough for the judge to understand him at a time when the trial court is in a proper position to do something about it." *Lankston v. State*, 827 S.W.2d 907, 909 (Tex. Crim. App. 1992).

Based on the exchange above, the trial court at least believed that it understood the nature of Crews's objections: the alleged failure to advise Crews of his rights before engaging in a noncustodial interrogation and that the video recording was not relevant to the issue on trial. It also appears, from the context of the exchange, that is what defense counsel was talking about. Given the circumstances of this objection, and the manner in which it was made, there was no indication that the trial court should have believed that the relevance complaint was specifically based upon the mention and/or discussion of prior crimes and/or prior bad acts and/or statements by Walker regarding "signs of deception" in the recorded interview with Crews. The court addressed the issue of whether there was any other evidence the defense wanted the court to review. After the trial court concluded that the recording indicated that Crews was advised of his rights prior to beginning the

interview with Walker, defense counsel stated, "I have nothing else." The opportunity presented itself for Crews to clarify the objection and to specifically state the basis of it to have involved the mention of extraneous offenses. It was Crews's responsibility to do all that was necessary to bring to the attention of the trial court the specific evidentiary rule in question and its precise and proper application to the evidence in question. *Reyna v. State*, 168 S.W.3d 173, 177 (Tex. Crim. App. 2005). This was not done.

Crews's reliance on *Montgomery* is misplaced; in that case, Montgomery was tried simultaneously under two indictments for indecency with a child committed against two of his three young daughters. Montgomery's former wife sought to testify regarding extraneous misconduct on the part of Montgomery involving inappropriate sexual conduct directed toward his children. Prior to admission of this testimony, Montgomery's counsel objected "on the grounds of relevancy *and also on the grounds this is getting into extraneous offenses*." *Montgomery*, 810 S.W.2d at 393 (emphasis added). In contrast, here, Crews failed to clearly and concisely advise the court of his complaint in order to permit the court the opportunity to act on the now-expressed complaint. Accordingly, Crews's claim of error with respect to the admission of the recorded interview with Walker was not preserved for appellate review.

This point of error is overruled.

**D.    The Doctrine of Cumulative Error**

In his final appellate point, Crews argues that he was denied a fair trial because of the numerous errors committed at trial and their associated harm. Because we find no abuse of discretion on the part of the trial court (and thus no error), we need not discuss any potential application of the doctrine of cumulative error.

This point of error is overruled.

**IV.    CONCLUSION**

The evidence is both legally and factually sufficient to support conviction. Further, there was no abuse of discretion in the admission of extraneous misconduct evidence. Moreover, there was a failure to preserve error with respect to the specific complaints of extraneous offense evidence and statements by Walker regarding Crews's exhibition of "the signs of deception," in Walker's recorded, noncustodial interrogation of Crews. Accordingly, we affirm the judgment of the trial court.

Bailey C. Moseley
Justice

Date Submitted:     December 7, 2009
Date Decided:      December 22, 2009

Do Not Publish

26